UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X
ADAN ABREU,                                                                                    DOCKET NO.: CV-15-58
                              Plaintiff                                                   (LDW) (SIL)


       -against-

VERIZON NEW YORK, INC., DAVID LUCAS, in                              **AMENDED**
his individual and official capacity, THOMAS BOLGER,                 **COMPLAINT**
in his individual and official capacity, RICHARD FRANCIS
in his individual and official capacity,

                            Defendants.                                         ***JURY TRIAL DEMANDED***
------------------------------------------------------------------------- X

      Plaintiff ADAN ABREU by and through his attorneys, the LAW OFFICES OF FREDERICK K. BREWINGTON, as and for his Amended Complaint, against the Defendants, states and alleges as follows:

## PRELIMINARY STATEMENT

      1.     Prior hereto, Plaintiff filed a Complaint on January 6, 2015.  This is the amendment of that Complaint which is done as none pursuant to the Order of the Honorable Steven I. Locke, dated January 29, 2016.  This is a civil action seeking monetary relief (including past and on going economic loss), compensatory and punitive damages, disbursements, costs and fees for violations of the Plaintiff's rights, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (as amended), 42 U.S.C. §§1981, and 1988, New York State's Human Rights Law, Executive Law art. 15.

      2.     Specifically, the Plaintiff alleges that the collective Defendants engaged in discrimination and retaliation and negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiff of the appropriate employment position and title and

pay through acts that were taken against Plaintiff because of his race, color, and national origin. These acts resulted in misrepresentation, misinformation, harassment, and character assassination.

3. Said acts were done knowingly with the consent and condonation of VERIZON NEW YORK (hereinafter "VERIZON"), DAVID LUCAS (hereinafter "LUCAS "), THOMAS BOLGER (hereinafter "BOLGER"), and RICHARD FRANCIS (hereinafter "FRANCIS") with the express purpose of targeting and silencing the Plaintiff, and generally violating his rights as protected by the United States and New York State Constitutions, and federal and state statutes, rules and regulations.

**JURISDICTION AND VENUE**

4. The jurisdiction of this Court is invoked under 28 U.S.C. §§1331 and 1343.

5. This Court is requested to exercise pendant jurisdiction with respect to Plaintiff's State law claims pursuant to 28 U.S.C.§ 1367.

6. Venue in the Eastern District of New York is proper under 28 U.S.C. §1391, based on the fact that Plaintiff resides in Suffolk County, New York and the Defendant is conducting business in the State of New York, specifically Suffolk County.

7. Prior hereto, on May 13, 2013 Plaintiff filed Charge of Discrimination Case No. 10162287 against Defendants with the New York State Division of Human Rights (hereinafter "NYSDHR") alleging his wrongful discrimination due to the Defendants' animus on the basis of Plaintiff's race, color, and national origin. NYSDHR cross filed a charge of discrimination with the United States Equal Employment Opportunity Commission (hereinafter "EEOC"), under EEOC Charge No. 16G-2013-03439.

8. On October 9, 2014, Plaintiff received a Notice of Right to Sue Within 90 Days,

issued by the U.S. Department of Justice with regard to EEOC Charge No. 16G-2013-03439 (copy annexed hereto Exhibit A). As of the filing date of this complaint, ninety days from the date of receipt of the Notice of Right to Sue has not yet passed.

9. Plaintiff has requested, and received a dismissal for administrative convenience on Charge No.: 10162287 from NYSDHR.

## PARTIES

10. Plaintiff, ADAN ABREU (hereinafter PLAINTIFF or Mr. ABREU), at all times relevant in this Amended Complaint, is a Hispanic male with dark skin originating from the Dominican Republic, and a citizen of the United States of America. Plaintiff resides in the County of Suffolk, State of New York

11. During all times relevant in this Amended Complaint the Defendant VERIZON NEW YORK, INC., (hereinafter "VERIZON") is a duly constituted corporation in the State of New York.

12. During all relevant times in this Amended Complaint, Defendant DAVID LUCAS (hereinafter "LUCAS") is a white male, sued here in his official and individual capacity, as an employee and agent of Defendant VERIZON.

13. During all relevant times in this Amended Complaint, Defendant THOMAS BOLGER (hereinafter "BOLGER") is a white male, sued here in his official and individual capacity, and is an employee and agent of Defendant VERIZON.

14. During all relevant times in this Amended Complaint, Defendant RICHARD FRANCIS (hereinafter "FRANCIS") is a white male, sued here in his official and individual capacity, and was an employee and agent of Defendant VERIZON.

**FACTUAL ALLEGATIONS**

15. Plaintiff is Black-Hispanic and is the only non-Caucasian Field Technician in his department, which employed approximately 30 Field Technicians.

16. Plaintiff ABREU was hired by VERIZON approximately 25 years ago in 1988 as a Core Field Technician. After approximately 18 years of employment, in 2007 due to his seniority, Plaintiff was promoted to work as a Core Field Technician located on Fire Island. For approximately the next 6 or 7 years, Plaintiff was assigned to work on Fire Island exclusively.

17. A job assignment on Fire Island is considered a promotion for Verizon Core Field Technicians, as there is an opportunity to work over time hours, thus earning significantly more money. In addition, there is less direct daily supervision.

18. During his assignment on Fire Island, Plaintiff's foreman was Defendant FRANCIS, who for years had singled out Plaintiff for differential and discriminatory treatment, making his life miserable. Defendant FRANCIS would ridicule the Plaintiff, single him out for various things, and target the Plaintiff and not his white peers. Although Defendant FRANCIS never made any formal complaints about Plaintiff, he constantly sought to incite Plaintiff for no stated reason.

19. Defendant FRANCIS made threatening remarks to the Plaintiff such as telling Plaintiff that he "would be sure to get [plaintiff] out of [there] before [FRANCIS] retires." Further, Defendant FRANCIS intentionally relocated Plaintiff on Fire Island at one point to a zone where there were no bathroom facilities, when Plaintiff's white coworkers were not relocated to this zone.

20. Defendant FRANCIS eventually retired at the end of the summer in 2012. Defendant LUCAS was his successor.

21. Upon information and belief, Defendant LUCAS succeeded Defendant FRANCIS as

Plaintiff's manager and the two Defendant LUCAS and Defendant FRANCIS are very good friends.

22. While working on Fire Island during the summer of 2012, Plaintiff was intentionally assigned on numerous occasions to work in areas that were covered with poison ivy. On these occasions, Plaintiff sought to prevent the spread of a poison ivy infection, in particular he wanted to prevent spreading it to his own family members.

23. Plaintiff's own skin was not allergic to poison ivy, but in order to ensure not passing the infection to anyone, Plaintiff would remove his Verizon t-shirt while performing work in areas where the poison ivy was located, and wore a tank top instead. Upon completion of his job in the poison ivy location, Plaintiff would put his Verizon t-shirt back on.

24. During all relevant times in this Complaint, upon information and belief, there were other Verizon Core Field Technicians who were similarly situated white individuals who did not wear their Verizon t-shirts on various occasions, however these individuals did so without having any reason for doing so.

25. Upon information and belief, a dress code had never been enforced on Fire Island except when a local manager knew that a superior such as a District Level Manager might be visiting the location. Witnesses attested to the fact that the dress code was not regularly enforced on Fire Island.

26. On one occasion during the summer of 2012, Defendant BOLGER approached Plaintiff when he was not wearing his Verizon t-shirt, but he was sitting with his lunch in his lap. Defendant BOLGER asked Plaintiff if he was having lunch, to which Plaintiff responded "yes", he was on his lunch break. There is no requirement that an employee stay in full uniform while he is on his lunch break.

27.     Thereafter, without having confronted Plaintiff about not having his Verizon t-shirt on, Defendant BOLGER received help from Plaintiff with a vehicle that the Defendant wanted to use, without incident. This occurred 3 days before Defendant LUCAS became Plaintiff's manager.

28.     Several days later, 3 days after Defendant LUCAS became Plaintiff's manager, while at work Plaintiff went to his truck to remove his clothing in preparation for running wire through an area of poison ivy. He returned to the site of his job in order to complete the procedure. At the time Plaintiff returned to his site location, there were about 4 or 5 other Core Field Technicians, all of whom were white men, working on a job about 100 yards away from his location. Not one of these field technicians was wearing a Verizon t-shirt. All of these employees were white men.

29.     On this occasion, Defendant LUCAS approached the other 4 or 5 technicians and told them to put their t-shirts and gear on. Immediately following, Defendant LUCAS approached Plaintiff and asked Plaintiff why he was not wearing his t-shirt.

30.     Plaintiff was never told to put his shirt on and tried to explain to Defendant LUCAS why he was not wearing his Verizon t-shirt, but later that afternoon, Plaintiff was told by Defendant LUCAS that "he would be removed from working on Fire Island," which had been Plaintiff's work location for the previous 7 years based on his seniority.

31.     The following day, the same individuals who had not been wearing Verizon t-shirts again showed up to work without having their Verizon t-shirts on, *and* they were wearing shorts. Defendant LUCAS did not threaten their positions or site locations.

32.     Following these incidents, Plaintiff approached his Union business agent, Ron Muskarella, seeking assistance in dealing with this blatant discrimination. The Mr. Muskarella told Plaintiff that Defendant LUCAS had informed him that "as long as Defendant LUCAS and

Defendant BOLGER are in charge, Plaintiff would never work on Fire Island again." This statement reflecting a clear intention to not only target the Plaintiff on account of his race, color, and national origin, but to make his employment situation as unpleasant and hostile as possible.

33. Furthermore, Plaintiff was frequently tormented, and ridiculed by other Verizon employees because he *was so* diligent about wearing his Verizon issued shirt, when it was widely known and understood that many technicians did not wear their Verizon issued clothing. However Plaintiff was fearful that his job was at stake if he behaved in the same manner as his white colleagues.

34. In August of 2012, Plaintiff filed a complaint of discrimination to the Verizon ethics committee claiming that he was subjected to mistreatment, humiliation, and hostile work environment on the basis of his race, color, and national origin. Immediately following this, Plaintiff was transferred off of Fire Island for the dress code violation,

35. As part of the retaliation for Plaintiff's filing of a complaint to the Verizon ethics committee, he was transferred back to the mainland; a clear indication of retaliation on the part of Defendants because Plaintiff exercised his right to file a discrimination claim that he was being treated differently than his white peers.

36. Plaintiff's complaint was responded to by retaliation in that he was punished and removed from working on Fire Island and was not allowed to return. Further, approximately 7 months passed after his complaint when Plaintiff received a phone call from an employee in human resources at Verizon advising him that Defendant VERIZON had determined that he was not subjected to any discrimination on the basis of his race.

37. To date, Plaintiff has not received anything in writing regarding said "determination,"

7

but he has been subjected to the loss of his position and work status.

38. This "determination" upon information and belief, was not based on any investigation that included interviewing and obtaining any information from Plaintiff himself. Furthermore, upon information and belief, rebuttal to NYSDHR, Defendant failed to interview witnesses and Human Resources failed to properly investigate the matter, and they provided no specifications of the steps taken to investigate the complaint, nor did they provide Plaintiff with specificity who was interviewed with regard to same.

39. Shortly after Plaintiff was removed from Fire Island and returned to the mainland, Plaintiff was continuously abused, mistreated, and subjected to differential treatment by Defendant LUCAS and Defendant BOLGER.

40. Defendant LUCAS was in charge of selecting technicians to be assigned to Fire Island's post in September 2012, after Plaintiff had been removed from working in Fire Island. Plaintiff made his interest known to Defendant LUCAS that he wanted to return. Despite Plaintiff's skill, expertise, knowledge, and seniority, he was not chosen to return to Fire Island, even after he questioned this decision and made Defendant LUCAS aware that Fire Island was his preference, he was made to suffer for his actions.

41. The placement on Fire Island is based on seniority, and Plaintiff had more seniority than the white male who was selected over him. Plaintiff should have been chosen because after Plaintiff asked why he was not chosen, he was not provided any explanation for why he was not chosen to return to Fire Island.

42. Plaintiff had never been reprimanded for insubordinate behavior, poor performance, or not following proper protocol according to the Verizon policies. In fact, Plaintiff performed his

job adequately and in a sufficient manner such that he remained an employee for over 25 years.

43. The facts clearly demonstrate that the foregoing actions can only be viewed as retaliation for Plaintiff making a formal complaint to the ethics board about the discriminatory actions taken against him, as these instances occurred within a month of when Plaintiff filed his complaint.

44. In addition, there are other Verizon employees, who were white individuals, who engaged in serious infractions against company policy who not only remained on Fire Island as their assigned post, but were not reprimanded for their actions in any way. However, Plaintiff was told he was being removed from Fire Island for not wearing Verizon t-shirt.

45. On one occasion, Tom Keller, a similarly situated white employee violated a company policy by allowing a vendor to take possession and drive his Verizon vehicle  This violation created several dangerous liabilities for both the company and the individuals working in the area. There was never any investigation into this matter and Mr. Keller was not disciplined, let alone removed from working on Fire Island.

46. One of the cable splicer employees lent out the key to a Verizon vehicle for a local contractor in the area to use, which is against company policy. The contractor received a traffic ticket and the situation was resolved when the fine was paid. Upon information and belief, this person that lent out the Verizon vehicle is a white male and is still an employee and was never reprimanded, let alone transferred off of Fire Island.

47. On another occasion during the summer of 2010, Chris Riordan, a white male and a Verizon employee, was found to have violently kicked and injured a sea creature on Fire Island, with no purpose related to his duties as an employee. As a result, Mr. Riordan appeared in Federal Court

in the Eastern District of New York in Central Islip, charged with wrongful acts and he was mandated to pay a fine. This incident has been in the possession of Defendants for several years and became widely known throughout the company.

48. Upon information and belief, Verizon technicians are held to a high standard with regard to how they are to interact with and treat the surrounding environment in which they are located. Wildlife on Fire Island is protected as Fire Island National Seashore.

49. Upon information and belief, Mr. Riordan was removed from Fire Island while the case was pending in court, but later returned to Fire Island.

50. Furthermore, another employee, Ron Haff, a white male, was found on several occasions not wearing proper company boots while at work on Fire Island. Mr. Haff was verbally warned about this infraction, but he was never removed from working on Fire Island or otherwise disciplined.

51. The foregoing examples are a demonstration of the kind of habitual practice of Defendant VERIZON and its agents, Defendant LUCAS and Defendant BOLGER by their distinct and intentional differential treatment of Plaintiff, based solely on his race, color, and national origin.

52. On January 10, 2013 Plaintiff wrote a letter to Rob Connelly, the District Manager, to inform him of the discrimination, mistreatment, and retaliation to which he was being subjected and to seek help from him as to how to deal with the current situation at that time.

53. To this day, Plaintiff has never received a response from Mr. Connelly and his complaints and inquiries continued to be ignored.

54. Defendant LUCAS treated the Plaintiff as though he was "out to get" the Plaintiff. There were never any white employees that were reprimanded due to a dress code violation.

55. For instance, on the same day Plaintiff was removed from Fire Island for an alleged violation of a dress code, there were several other Verizon employees who were not wearing their Verizon t-shirts or shorts and were not reprimanded. The only difference between them and Plaintiff is that they were white individuals.

56. Plaintiff was repeatedly treated differently from his similarly situated white peers and when he made formal complaints about the discrimination, not only were the complaints ignored, but he was retaliated against by his supervisors. Plaintiff was subjected to ongoing hostile work conditions when he was not given the opportunity to return to Fire Island despite his seniority.

57. Plaintiff has suffered severe physical, emotional, and monetary loss as a result of this ongoing and repeated discrimination. Plaintiff has suffered from loss of sleep, physical and emotional anxiety and depression, and was forced to take three different absences for short term disability as a result of his anxiety, which prevented him from working.

58. Each time Plaintiff was on short term disability, it was due to his severe anxiety which was caused by the discriminatory actions taken against him. Plaintiff was unable to work for at least 3 or 4 months, and one time he was out for approximately 6 months. During his 6 month leave, he was not given short term disability payments, resulting in only earning a salary of $68,000 during his final year on the job.

59. During each period that Plaintiff was on short term disability between October of 2012 through March of 2014, he was undergoing psychological treatment, which included both therapy and medication management. Plaintiff was diagnosed with severe anxiety by his psychologist.

60.     Plaintiff was earning approximately $80,000 annually as a base salary when he was working on Fire Island, which does not include overtime work. The opportunity for overtime is significantly greater on Fire Island than on the mainland. Including Plaintiff's overtime in 2012, he earned approximately $120,000 before being removed from Fire Island. After Plaintiff was removed from Fire Island, there was significantly less opportunity to earn overtime pay and therefore, since he was removed from Fire Island, he has earned only $68,000 as a base salary, nearly half what he previously on Fire Island.

61.     Furthermore, the working conditions because of this discriminatory treatment became so intolerable that Plaintiff felt compelled to enter into an earlier retirement than originally planned, amounting to a constructive discharge. Plaintiff consulted with his physician who suggested that he retire because he was not fit to continue working under these conditions. Plaintiff retired in December 2014, which was about five to ten years earlier than Plaintiff had originally planned on retiring, as he saw no hope of the conditions facing him changing.

62.     As a result of this constructive discharge, Plaintiff suffered extreme economic losses in the past and into the future. Plaintiff lost an additional approximate amount of $250,000 that he would have obtained upon retirement had he retired only two and half years later. Plaintiff also suffered an economic loss from the additional amount of money that he would have accumulated on his 401K, had he retired five to ten years later as he had originally planned. However, the conditions at work became so unbearable that Plaintiff was willing to accept these extensive economic losses in order to free himself from the stresses, discrimination, humiliation, and ridicule that he endured at the deliberate hands of the DEFENDANTS at work.

63. Plaintiff has suffered from ongoing mental anguish, emotional pain and suffering, embarrassment, humiliation, depression, and psychological damage as a result of the ongoing and continuous discrimination and retaliation. Prior to receiving treatment for his anxiety, depression, and psychological damage related to this claim, Plaintiff had never received prior treatment. The course of treatment which Plaintiff has undergone includes over a year of therapy treatment and medication management, all of which was caused by the Defendants.

## AS AND FOR A FIRST COUNT
## TITLE VII, CIVIL RIGHTS ACT of 1964, 42 U.S.C. § 2000e

62. Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 61 inclusive of this Amended Complaint, with the same force and effect as though herein fully set forth herein.

63. Defendant VERIZON, through their agents and employees, discriminated against the Plaintiff in his employment based on Plaintiff's race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.

64. As a direct result of said acts, Plaintiff has been deprived of his rights and freedoms, mentally and physically harmed, to the extent of which he suffered from his loss of his employment. Plaintiff has been forced to seek retirement, rather than continue to be the subject of abuse, ridicule, and discrimination. He has been subjected to humiliation, loss of dignity, loss of title/ status, disregard for his seniority, removal from his position, removal from his assignment, and suffered a diminished quality of life. Plaintiff has incurred incidental fees/ damages, loss of pay, loss of benefits, and other damages/ injuries due to the constructive discharge from his career and employment.

65. As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of three million ($3,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

**AS AND FOR A SECOND COUNT**
**42 U.S.C. § 1981**

66. Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 65 inclusive of this Amended Complaint, with the same force and effect as though herein fully set forth.

67. The above discriminatory pattern and practice based on race and color by Defendant VERIZON through their agents and employees violates 42 U.S.C. §1981 as amended by the Civil Rights Restoration Act of 1991 (Publ. Law No, 102-406).

68. As a direct and proximate result of said acts, Plaintiff has suffered loss of employment and continues to suffer loss of income, and has suffered and continues to suffer emotional distress, humiliation, great expense, embarrassment, and damage to his reputation.

69. Because of Plaintiff's color he has been subjected to different, disparate, and abusive mistreatment as detailed above and has been treated differently than white individuals.

70. As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of three million ($3,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

## AS AND FOR A THIRD COUNT
## NYS HUMAN RIGHTS LAW, EXECUTIVE LAW ART. 15

71. Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 70 inclusive of this Amended Complaint, with the same force and effect as though herein fully set forth.

72. The above discriminatory pattern and practice based on race, color, national origin by Defendants, their agents, and employees violates New York State law.

73. As a direct and proximate result of said acts, Plaintiff has been deprived of his rights and freedoms, mentally and physically harmed, to the extent of which he suffered from his loss of his employment. Plaintiff has been forced to seek retirement, rather than continue to be the subject of abuse, ridicule, and discrimination. He has been subjected to humiliation, loss of dignity, loss of title/ status, disregard for his seniority, removal from his position, removal from his assignment, and suffered a diminished quality of life. Plaintiff has incurred incidental fees/ damages, loss of pay, loss of benefits, and other damages/ injuries due to the constructive discharge from his career and employment.

74. Because of Plaintiff's race, color, national origin, he has been subjected to different, disparate, and abusive mistreatment as detailed above and has been treated differently than White individuals in that Plaintiff has been treated as stated herein because of his race, color, and national origin.

75. As a result of Defendant's acts, Plaintiff suffered, and is entitled to damages sustained to date and continuing in excess of three million ($3,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

## PRAYER FOR RELIEF

Plaintiff requests judgment as follows:

a. First Cause of Action: in excess of three million ($3,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

b. Second Cause of Action: in excess of three million ($3,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

c. Third Cause of Action: in excess of three million ($3,000,000.00) dollars as well as punitive damages, costs and attorney's fees..

d. Attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k);

e. A declaratory judgment stating that Defendants wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

f. Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

g. An Order granting such other legal and equitable relief as the court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: Hempstead, New York
February 4, 2016

                                      LAW OFFICES OF
                                      FREDERICK K. BREWINGTON

                       By:   */S/ Frederick K. Brewington*
                                FREDERICK K. BREWINGTON
                                *Attorneys for Plaintiff*
                                556 Peninsula Boulevard
                                Hempstead, New York  11550
                                (516) 489-6959