UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ADAN ABREU,

                              Plaintiff,

      -against-

VERIZON NEW YORK, INC., DAVE LUCAS, in
his individual and official capacity, TOM
BOLGER, in his individual and official capacity,
and RICHARD FRANCIS, in his individual and
official capacity,

                          Defendants.
-----------------------------------------------------------------x

**MEMORANDUM AND ORDER**
15-cv-00058 (SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

      Presently before the Court, after a jury verdict in this employment discrimination and retaliation action filed by Plaintiff Adan Abreu ("Plaintiff" or "Abreu") against Defendants Verizon New York, Inc. ("Verizon"), Thomas Bolger ("Bolger")[1], Richard Francis ("Francis"), and David Lucas ("Lucas") (Bolger, Francis and Lucas collectively, the "Individual Defendants," and together with Verizon, "Defendants"), is Defendants' motion for judgment as a matter of law pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 50, or, in the alternative, pursuant to Fed. R. Civ. P. 59, for a new trial or for remittitur of the damages award.  *See* Docket Entry ("DE") [102].  For the following reasons, Defendants' motion is granted in part and denied in part.

---

[1] While Bolger's name appears as "Bulger" in the case caption and numerous filings, he spelled his name as "Bolger" at trial.  *See* Transcript of Trial Before the Honorable Steven I. Locke, United States [Magistrate] Judge, and a Jury ("Tr."), DE [103-1]-[103-11], 972.

## I.   BACKGROUND[2]

By way of Complaint filed on January 6, 2015, Plaintiff commenced this action against his former employer Verizon and the Individual Defendants asserting claims of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL").  *See* DE [1].[3]  Discovery was completed on June 29, 2017, *see* DE [44], and on July 10, 2017, trial began before the Honorable Leonard D. Wexler.  *See* DE [55].  The following day, Judge Wexler declared a mistrial and advised the parties that the matter would be assigned to this Court for all purposes.  *See* DE [56].[4]  Trial commenced before this Court on March 11, 2019.  *See* DE [80].

### A.  <u>The Evidence at Trial[5]</u>

Abreu, who was born in the Dominican Republic, testified that he has always identified as Black Hispanic and that his native language is Spanish.  *See* Tr., 437:22-438:7.  After serving for four years in the Marine Corps reserves and completing college with a degree in aerospace engineering, Plaintiff began working for Verizon

---

[2] As the parties' familiarity with the extensive procedural history of this litigation is presumed, the Court sets forth only background material that is directly relevant to the instant motion.

[3] Abreu subsequently filed an Amended Complaint on February 4, 2016.  *See* DE [18].

[4] The parties had previously filed a Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (the "Consent Form"), which memorialized their consent that the matter proceed before this Court for all purposes pursuant to 28 U.S.C. § 636(c), on March 1, 2017.  *See* DE [30]. Notwithstanding the parties' execution and submission of the Consent Form, Judge Wexler continued to preside over the matter until he referred it to this Court for all purposes on July 11, 2017.  *See* DE [57].

[5] As discussed further below, the Court granted in part Defendants' Rule 50(a) motion prior to summations and dismissed Plaintiff's constructive discharge and hostile work environment claims. Accordingly, the jury was charged only on Abreu's discrimination and retaliation claims, and the Court sets forth only the testimony that is relevant to those claims.

in 1987.  *Id.* at 438:8-440:1.  He first worked as an operator for approximately eight years and in 1997 became a field technician.  *Id.* at 440:2-441:11.  As a field technician, Abreu first worked in Brooklyn, and, with the goal of working closer to home on Long Island, requested several transfers until he finally ended up in Holbrook, which was approximately ten minutes away from his house.  *Id.* at 441:12-442:12.  Verizon employees assigned to Holbrook worked on either Long Island (the "Mainland") or on Fire Island.  *Id.* at 442:13-25, 677:17-18.  Abreu worked on the Mainland for approximately seven or eight years, and sometime between 2005 and 2007, he transferred to Fire Island, where he spent approximately seven years.  *Id.* at 442:13-443:2.

  i.  *Abreu's Employment on the Mainland*

Defendant Francis was the first-level manager who supervised Plaintiff on the Mainland.  *Id.* at 443:3-17; *see also* 57:22-58:15.  Sometime in 2005, Abreu complained about Francis's treatment of him.  *Id.* at 443:18-23.[6]

According to Plaintiff, Francis would assign him more work than he could complete in an eight-hour work day—sometimes as much as 16-hours' worth of work—and when Abreu would tell Francis that he was unable to complete the assignments, Francis would scream at him and insist that he had to finish the work.  *Id.* at 443:24-444:14.  Francis denied ever assigning Plaintiff 16-hours' worth of work

---

[6] Although he could not remember the exact year in which he made his complaint, Abreu testified that it was approximately two years before he went to Fire Island, which was sometime around 2005 to 2007.  *Id.* at 443:1-2, 21-23.  On cross-examination, Plaintiff struggled to pinpoint the exact year in which the events precipitating the complaint occurred or when he made this complaint.  *Id.* at 631:14-632:12.

to complete in an eight-hour day, explaining that work was assigned by dispatch and that he only reviewed assignments to make sure that the technicians had received "jobs that are suited to them." *Id.* at 127:3-128:3. He further explained that technicians, such as Abreu, would receive "[n]o more than four" assignments in a day, unless all the work was in one location, in which case they could have received up to six jobs a day. *Id.* at 128:4-9, 160:19-23. According to Plaintiff, on one occasion, he tried to explain to Francis that he had given him too many assignments, and Francis asked Abreu to join him in another room, where he began telling Plaintiff about various work rules, which Abreu "realized . . . only applied to [him]." *Id.* at 444:16-446:2. Accordingly, Plaintiff told Francis that he would need to see these rules "in writing with an official Verizon paper," at which point Francis "got up and . . . walked to the door and then . . . stood between [Abreu] and the door." *Id.* at 446:10-21. Francis began yelling at Plaintiff and "tr[ying] to humiliate [him]" by saying that other employees teased him about being a former marine, and Abreu yelled back. *Id.* at 446:22-447:4. Francis "wouldn't get out of [Plaintiff's] way," so he could not leave the room. *Id.* at 447:3-13. Francis denied that this altercation ever occurred. *Id.* at 128:16-21, 161:3-18.

Abreu testified that after this incident, he wrote a letter to Francis's boss, Tracy Reiss ("Reiss"), stating that he would sue Verizon, "or at least Mr. Francis," for harassment. *Id.* at 447:17-448:6. Reiss held a meeting with Plaintiff, Francis and shop steward Tommy Norman ("Norman"), where Francis "acknowledge[d] that he was wrong," to which Abreu responded that he did not want to "have any problems,"

and just wanted to "be left alone . . . [and] do [his] job." *Id.* at 447:21-448:11.  At trial, Plaintiff did not have any notes from this meeting, nor did he have a copy of the letter that he claimed to have written Reiss.  *Id.* at 640:1-4.  Francis denied that Abreu complained about him or that he ever participated in this meeting with Plaintiff, Reiss and Norman.  *Id.* at 50:21-51:12,[7] 109:23-110:17, 129:5-16.

Abreu testified that even after this meeting, Francis continued to harass him, for instance by taking him aside to speak to him for failing to satisfy certain administrative requirements, while letting other employees who acted similarly off with nothing more than a reminder.  *Id.* at 448:13-449:5, 615:4-25.  Plaintiff informed the chief shop steward[8] of Francis's conduct, and the chief shop steward said that Francis was "probably trying to build a case" against Abreu so that when Plaintiff "finally made a mistake" Francis would be able to point to the numerous issues he had previously discussed with him.  *Id.* at 449:6-14, 645:3-24.  Accordingly, the shop steward suggested that Abreu ask to be moved to another group.  *Id.* at 645:15-24.  After speaking to Reiss, Plaintiff was moved to work with Brad French ("French"), who gave him the opportunity to work on Fire Island.  *Id.* at 449:16-451:4.

According to Abreu, and his former coworker Stephen Moore ("Moore"),[9] assignments to Fire Island were based on seniority, *id.* at 420:24-421:9, 452:11-24, although this is not set forth in the applicable collective bargaining agreement.  *Id.*

---

[7] On direct examination, Plaintiff's counsel incorrectly asked about Abreu's complaint from 2010, but Francis's cross-examination testimony, as well as Plaintiff's testimony, made clear that the purported complaint was made in 2005, not 2010.

[8] There was no testimony presented regarding the name of the chief shop steward.

[9] Moore worked on Fire Island for approximately two years as a field technician.  *Id.* at 392:3-10.

at 616:11-617:10.  Defendants Francis and Bolger, however, denied that seniority played a role in assignments to Fire Island.  *Id.* at 54:6-9, 1002:10-20.

ii.   *Abreu's Employment on Fire Island*

On Fire Island, Plaintiff was the only person of color.  *Id.* at 518:23-519:4.  His former coworkers, Arthur Polosino ("Polosino"),[10] Moore, and Christopher Riordan ("Riordan"),[11] testified that they had known when working with him that Plaintiff was Hispanic and the only non-Caucasian employee on Fire Island, and Moore noted Abreu's accent and "very dark" skin.  *Id.* at 183:10-16, 398:9-22, 952:18-953:2.  According to Abreu, his coworkers were also aware of his ethnicity because he would occasionally serve as an interpreter for his coworkers who made service calls in Spanish-speaking homes.  *Id.* at 483:1-17.

Defendants, however, denied knowing that Abreu was Black Hispanic.  Francis testified that he did not know until he began preparing for trial that Abreu was not Caucasian.  *Id.* at 59:21-60:1.  Francis, who supervised a group consisting entirely of Caucasian men, testified that Plaintiff "didn't appear to be any different than anybody else that worked for [him]" and that he did not notice anything about Abreu's speech, despite having spoken to him on many occasions.  *Id.* at 59:15-18, 60:2-12, 74:18-23.  Similarly, Defendant Lucas,[12] who occasionally filled in as Abreu's supervisor on Fire Island, *id.* at 210:8-19, testified that he did "not really" know that

---

[10] Polosino is a former Verizon employee of 32 years who worked on Fire Island from approximately 2003 until his retirement in 2013.  *Id.* at 171:20-25, 173:1-9.
[11] Riordan worked on Fire Island from approximately 2002 to 2015.  *Id.* at 933:16-934:12.
[12] Lucas worked on Fire Island for a few years around 2007 and again from around 2011 to 2013.  *Id.* at 207:2-208:4, 323:1-3.

Abreu was "a man of color" prior to the instant lawsuit, but, unlike Francis, he recognized that Plaintiff had an accent and "was probably a little tanner than most . . . of the other people in the garage," who were Caucasian. *Id.* at 241:7-15, 279:10-20. Defendant Bolger, who was the supervisor and area manager of the Holbrook garage in 2012, *id.* at 972:7-974:12, also denied knowing that Plaintiff was Black Hispanic until he learned as much in connection to the instant lawsuit, noting that he did detect an accent, but that Plaintiff is "not darker than all Caucasians." *Id.* at 1042:3-24.

When he first began working on Fire Island, Abreu was assigned to the east end of the island, known as "Zone 3." *Id.* at 451:15-452:24. In addition to Zone 3, Verizon employees could work in the central area of the island, "Zone 2," or in the western part, "Zone 1." *Id.* at 73:15-74:5. At first, Plaintiff only worked in Zone 3 during the summer, but testified that when Verizon decided to base assignments on seniority, he "bumped" two less senior employees for a permanent assignment to Zone 3, as he was the third or fourth most senior person in his department. *Id.* at 452:15-24, 465:4-12, 502:4-14, 512:7-24. Abreu continued to work in Zone 3 for approximately six to seven years. *Id.* at 453:1-3, 464:22-465:3.

Around 2009 or 2010, Francis replaced French as the manager on Fire Island. *Id.* at 132:14-16. Francis served as the first-level manager on Fire Island for approximately two to three years. *Id.* at 54:10-12. During that time, Defendant Lucas also worked as a first-level manager on Fire Island, and eventually took over Francis's responsibilities when Francis retired. *Id.* at 54:10-57:2. Francis was under

7

Defendant Bolger's supervision, while Lucas reported to Tom Boyle ("Boyle"). *Id.* at 54:13-17, 210:20-21, 283:17-18.

Plaintiff testified that when Francis first arrived on Fire Island as the new manager, he approached Abreu, shook his hand and said "[L]isten, whatever happened in the past is the past. I'm not that kind of person anymore." *Id.* at 454:16-24. According to Plaintiff, Francis nevertheless resumed his harassment shortly thereafter. *Id.* at 455:2-3. Abreu testified that Francis would frequently check on him, to the point where other employees would call Plaintiff to let him know when Francis was on his way to his work zone because "everybody knew that [Francis] was coming for [him]." *Id.* at 455:4-14.

Approximately six months after Francis arrived on Fire Island, he transferred Plaintiff from Zone 3 to Zone 1. *Id.* at 453:1-11, 462:25-463:7, 683:4-12.[13] Francis testified that he initially transferred Plaintiff from Zone 3 to Zone 2 because there had been vandalism to some of Verizon's facilities in Zone 3, and he and Lucas had wanted to see if moving most of the employees to another Zone would alleviate the problem. *Id.* at 135:21-136:15. With respect to Abreu's subsequent reassignment to Zone 1, Francis testified that he could have been responsible but could not say with certainty that he had reassigned Plaintiff. *Id.* at 85:5-86:1. According to Francis, Abreu did not complain about this reassignment. *Id.* at 140:22-25.

Zone 1 differed from Zones 2 and 3 in several ways. Initially, while Zones 2 and 3 both had break areas for employees with bathrooms, refrigerators, couches and

---

[13] Once employees were assigned to work on Fire Island, Francis was in charge of assigning them to work in one of the three Zones on the island. *Id.* at 74:24-75:2.

beach chairs, Zone 1 only had an 8x6 foot shed without a bathroom. *Id.* at 406:7-408:3.   According to Moore and Riordan, employees working in Zone 1 would have to find bathrooms in the firehouse or the tennis club, or travel to another Zone to use the bathroom, *id.* at 407:13-408:3, 941:3-18, 945:3-20,[14] and Plaintiff testified that when he worked in Zone 1, he would have to "prepare [himself] to make sure [he] didn't have to go [to the bathroom] all day," or sometimes "go . . . behind somebody's house." *Id.* at 463:14-25.

Additionally, according to Polosino and Abreu, Zone 1 was "probably the worst" area to work in because it had "overgrown poison ivy" and "tick-infested terrain" as well as fewer boardwalks on which to walk. *Id.* at 176:6-178:4, 464:1-12.   Riordan, who had worked in all three Zones, testified that because of its terrain Zone 1 was slightly more difficult to work in than Zones 2 and 3, and he considered Zones 2 and 3 to be the preferable areas in which to work. *Id.* at 940:15-17, 942:25-943:3, 945:20-24.   Abreu further testified that working conditions in Zone 1 were also made more difficult by the requirement that employees use bicycles, rather than vehicles—even in rainy or cold weather—to get around certain areas in order to avoid damaging the boardwalks. *Id.* at 486:17-487:1.   In Zone 1, Plaintiff no longer had access to a Jeep, which had been his primary mode of transportation in Zone 3. *Id.* at 487:5-11; *see also* 81:6-11, 82:14-83:3.   Francis contested the testimony of Abreu, Polosino and

---

[14] On direct examination, Riordan referred to Zone 1 as Zone 3, but when presented with a map on cross-examination, agreed that the area he had been referring to as Zone 3 was, in fact, marked as Zone 1 on the map. *Id.* at 945:3-20.

Riordan, testifying that there was no difference between Zones 1 and 3 in terms of the difficulty of work.  *Id.* at 162:16-163:1.

When he was moved to Zone 1, Plaintiff felt as if he were "less than everyone else."  *Id.* at 488:9-489:8.  He began having problems and felt as if "someone else ha[d] taken over [his] brain" because he was "not the person that [he] used to be."  *Id.* at 518:16-22.  Abreu testified that he thought Francis "was a racist" because he was treating him differently than he treated the Caucasian employees.  *Id.* at 482:12-25. Francis, however, denied that any of the decisions he had made regarding Plaintiff had to do with his race or ethnicity.  *Id.* at 153:3-6.  Moreover, he testified that he had received training on Verizon's anti-discrimination and anti-harassment policies. *Id.* at 63:20-66:11, 68:14-70:9, 120:16-122:4.

Abreu asked Francis why he had transferred him to Zone 1, to which Francis replied:  "Before I retire, I'm going to make sure you get removed from Fire Island." *Id.* at 482:6-16.  Francis denied ever telling Plaintiff that he wanted to have him removed from Fire Island.  *Id.* at 132:18-25.  Approximately two months later, Abreu was removed from Fire Island and reassigned to the Mainland.  *Id.* at 683:13-684:1. Francis denied playing any role in removing Plaintiff from Fire Island, explaining that he had retired before Abreu was transferred back to the Mainland.  *Id.* at 51:24-52:1, 146:10-18.  Bolger corroborated this testimony, explaining that he had spoken only to Lucas about removing Plaintiff from Fire Island and did not consult Francis. *Id.* at 1003:1-13.

### iii.    *Abreu's Transfer from Fire Island to the Mainland*

Shortly after he had been transferred from Fire Island, Abreu learned that the reason for the transfer was because he had been seen during work hours without the Verizon-issued polo shirt, which technicians, such as Plaintiff, were required to wear. *Id.* at 86:2-6, 478:9-17.  Abreu testified that he believed his race to be the only basis for his removal from Fire Island because he "did better work than anyone else," was "the most dependable person [on Fire Island]" and, during his 28-year tenure with Verizon, had never been late or disciplined and had always been the "go-to-guy." *Id.* at 517:1-17.  Plaintiff considered that, in comparison to how his coworkers behaved on Fire Island, the idea that he had been removed because he had not worn his Verizon shirt on occasion was "just a joke," and made him feel like "crap" and like he was "lower than everyone else." *Id.* at 517:1-518:3.

Polosino, Moore, Riordan and even Defendants Francis and Lucas testified that they did not know of anyone else who had been disciplined or removed from Fire Island for being seen without their Verizon shirt.  *Id.* at 89:2-24, 183:2-5, 184:21-185:12, 215:12-18, 399:15-25, 952:7-14.  In fact, Francis and Lucas had observed employees without their Verizon shirts during work hours on more than one occasion. *Id.* at 86:16-87:16, 211:25-214:5.  Francis testified that he did not remove employees from Fire Island, or otherwise discipline them, for dress code infractions, even when those infractions were committed numerous times by the same employees.  *Id.* at 87:21-23, 89:2-24, 144:24-145:7.

Caucasian employees had been removed from Fire Island for other types of rule violations, however.   Francis had permanently removed a Caucasian technician named Edward Falkman ("Falkman") for sunbathing on the roof of the Central Office, *id.* at 148:15-24, 191:21-192:10, and he had removed Riordan for five months in response to an allegation that he had kicked a seal on the beach.  *Id.* at 114:18-116:10, 934:16-937:17.   Additionally, Lucas had removed Richard Delgiorno ("Delgiorno") for fixing a customer's service after Hurricane Sandy despite instructions not to do so, *id.* at 193:21-194:17, 200:21-201:13, 325:20-327:6, and Ronald Haff ("Haff") after he appeared in a published photograph wearing sneakers, which were not permissible footwear per the Occupational Safety and Health Administration ("OSHA") guidelines.  *Id.* at 327:18-329:19, 371:6-372:6.

According to Abreu, "Fire Island was a country club[,]" meaning that "[a]nything went," and he would see coworkers without their Verizon shirts, boots or safety gear or wearing flip-flops and shorts.  *Id.* at 458:21-459:12.  Moore, who "very rarely" wore his Verizon shirt, testified that employees did not always wear their Verizon shirts because the dress code "wasn't really enforced."  *Id.* at 397:8-399:3.  In fact, Francis had seen him without his shirt but had never disciplined him.  *Id.* at 398:24-399:14.  Moreover, on the same day that Plaintiff was disciplined for not wearing a shirt, other employees had been seen without shirts and in shorts, which they were not allowed to wear, but "no one said anything to them[.]"  *Id.* at 400:1-6. Employees also wore sneakers, instead of the required work boots, without repercussion.  *Id.* at 410:22-412:2.  Moore, who at the time of trial was still a Verizon

field technician, *id.* at 390:6-11, went on to say that "[y]ou could still go to any garage today and [the dress code is] lightly enforced[] [and] [t]here's lots of guys that don't wear Verizon shirts." *Id.* at 398:6-8. By contrast, Abreu did not wear flip flops, sneakers or shorts and was "known as the perfectionist[]" with respect to always wearing his Verizon shirt. *Id.* at 459:13-24. Plaintiff's coworkers, Polosino and Moore, testified that Abreu almost always wore his shirt, to the point where some of his coworkers teased him for doing so. *Id.* at 181:19-182:12, 401:4-24.

Plaintiff testified that he only took his Verizon shirt off when he was working among poison ivy, which—as most witnesses testified—was rampant throughout Fire Island. *Id.* at 91:13-92:13, 96:17-22, 185:13-15, 345:23-25, 460:2-462:3. Although he is not allergic to poison ivy—and consequently often helped his coworkers with work among poison ivy, *id.* at 185:16-187:7, 400:11-401:13, 424:17-21, 461:5-21—he was concerned about exposing his wife and children to the poison ivy from his clothes when he returned home. *Id.* at 460:2-13. According to Abreu and Moore, Verizon did not provide employees on Fire Island with full body suits, known as Tyvek suits, for protection from poison ivy. *Id.* at 425:1-7, 522:4-13.[15] So, to avoid contaminating his clothes, Plaintiff would take off his shirt and work in a tank top and then, after securing customers' permission, he would shower and wash his clothes in the outside showers located on the customers' properties and change into a spare set of clothes. *Id.* at 460:12-461:4, 515:1-24. According to Abreu, all of his coworkers knew about

---

[15] By contrast, Riordan testified that employees had access to Tyvek suits. *Id.* at 942:6-20.

this process.  *Id.* at 516:3-7.  Further, a Verizon-issued safety brochure about working

among poison ivy suggested that employees follow a similar process:

> Urushiol oil [the contaminant in poison ivy], if kept dry and cool, can remain potent for up to five years on contaminated tools and clothing, so wash all items immediately after use . . . . If you think you may have been in contact with poison ivy . . . the suggestions below can help you with treatment . . . . Wash all exposed areas with cold running water as soon as you can reach a stream, lake, or garden hose.  If you can do this within 5 minutes, the water may keep the urushiol from contacting your skin and spreading to other parts of your body.  Within the first 30 minutes, soap and water are helpful.  Wash your clothing preferably out doors [*sic*] in order to avoid further contact.  If you bring your clothes into your house[,] be careful that you do not transfer the urushiol to rugs and furniture.

Plaintiff's Trial Exhibits ("Pl. Tr. Ex."), 61; Tr.*,* 811:11-812:11.

The Individual Defendants had seen Plaintiff without his Verizon polo shirt on

several occasions.  The first to see Abreu without his shirt was Bolger.  In July of

2012, Bolger went to Fire Island to ensure that the employees there were aware that

customer-facing employees were required to wear their Verizon shirts during the

workday because he had been informed that the new "[V]ice [P]resident for the

Nassau[-]Suffolk operations," Manny San Pedro, was planning on visiting Fire

Island.  *Id.* at 975:17-983:6.  Around 11:00 a.m., he arrived at the Central Office in

Zone 2, where he saw Plaintiff asleep in his car.  *Id.* at 983:15-984:10, 988:7-11.  Abreu

and Bolger gave contradictory testimony regarding their interaction on that day.

According to Bolger, he "banged on the vehicle" and explained the reason for

his visit—namely, to ensure that employees were complying with the dress code.  *Id.*

at 984:2-23.  Additionally, he pointed out that Abreu was wearing a tank top, which

was "never allowed" during work and instructed him to put on his Verizon shirt.  *Id.*

at 984:11-25.  Plaintiff put on his shirt and told Bolger that he had been wearing a tank top because it was hot.  *Id.* at 984:24-985:5.  At the time, Abreu was on his lunch break, *id.* at 984:4-10, a time during which—as Bolger conceded—he was not being paid and could wear a tank top outside the Central Office.  *Id.* at 1049:11-12, 1052:2-1053:8.  Bolger then told Plaintiff that he was going to go look for other employees and asked that he help relay the message regarding the dress code because he did not "want to hear about the [V]ice [P]resident running across [employees] without their company attire."  *Id.* at 985:10-20.  Bolger did not go inside the Central Office to see if any other employees were inside on their lunch breaks, but instead spent about an hour and a half driving around looking for other employees.  *Id.* at 985:21-986:12, 1047:2-1049:2.  Unable to find anyone, he returned back to the Mainland.  *Id.* at 988:15-21.  During this visit to Fire Island, Bolger spoke only to Abreu.  *Id.* at 1025:25-1026:14.  At no point, before or after this visit, did Bolger e-mail or otherwise contact the Fire Island employees to convey the message regarding the dress code that he had purportedly come to deliver.  *Id.* at 1025:2-24.

By contrast, Plaintiff testified that he did not discuss the Verizon shirts or the dress code at all with Bolger.  According to Abreu, Bolger had approached him as he was eating lunch in his car and asked whether he could help tow a vehicle that had broken down.  *Id.* at 467:5-468:2, 470:9-471:11.  Plaintiff said that he would help as soon as he was done with his lunch, and before he had finished, Bolger returned to tell him that he had resolved the problem.  *Id.* at 470:24-471:11.  Although Abreu was wearing a tank top and shorts, Bolger did not mention anything about his attire.  *Id.*

at 471:12-22.  After this, Plaintiff never encountered Bolger again, nor did he discuss the encounter with Francis or Lucas, or otherwise receive any feedback.  *Id.* at 472:3-474:4.

At some point after his encounter with Bolger, Abreu was approached by Lucas at a house where he was working.  *Id.* at 474:8-21.  According to Plaintiff, Lucas asked him why he was not wearing his Verizon shirt, to which Abreu replied that he was not allergic to poison ivy and could simply rinse its remnants from his body after he finished his work, and had therefore removed his shirt to minimize the presence of poison ivy on himself after he had finished working.  *Id.* at 490:18-491:7.  Lucas, however, testified that Plaintiff had replied that he was hot and that there had been no discussion of poison ivy.  *Id.* at 214:6-215:11, 237:25-238:8, 344:1-10.  Lucas then asked Abreu whether Bolger had spoken to him about wearing his Verizon shirt, to which Plaintiff replied in the negative.  *Id.* at 344:1-10, 477:10-15, 491:12-20.  Lucas did not advise Abreu that if he were to be seen without his shirt again, he could be disciplined, even though Verizon's Associate Workplace Attire Guidelines ("Attire Guidelines") provided that managers were to discuss dress code infractions with their reports.  *Id.* at 287:14-288:4, 295:20-298:8; *see also* Pl. Tr. Ex. 60.  Lucas admitted that this was the only time he had ever seen Plaintiff violating the dress code or any other rule.  *Id.* at 230:7-12.

After this encounter with Abreu, Lucas spoke to Defendant Bolger about Plaintiff.  *Id.* at 216:4-14, 240:3-21, 994:10-18.  He took the matter to Bolger because he had heard that Bolger had previously seen Abreu without a shirt during lunch.

*Id.* at 216:10-14.  Lucas did note, however, that during lunch, employees could do "[p]retty much whatever they like, as long as there's . . . nothing ethical[ly] wrong with it."  *Id.* at 218:17-20.  Indeed, during his time on Fire Island from 2011-2013, Lucas had sometimes seen employees taking lunch inside the Central Office with their Verizon shirts hung "on the chair they were sitting [i]n."  *Id.* at 230:23-232:15.  Defendant Francis and Moore similarly testified that employees were not required to wear their Verizon shirts during their lunch breaks.  *Id.* at 106:21-25, 408:18-25.  Further, Francis conceded that he had never instructed Plaintiff to wear his Verizon shirt during his lunch breaks.  *Id.* at 107:1-4; *see also id.* at 469:1-20 (Abreu's testimony that Francis told employees on a conference call:  "I don't care what you do during your lunch.").  Lucas told Bolger that he had come across Plaintiff not wearing his Verizon shirt.  *Id.* at 240:3-21, 994:16-18.  Bolger was "taken aback" and asked Lucas what reason Abreu had given him for why he was not wearing the shirt.  *Id.* at 994:19-995:4.  Upon learning that Plaintiff had told Lucas that he had not been wearing his shirt because he was hot, Bolger instructed Lucas to tell Abreu to report to the Mainland the following business day.  *Id.* at 995:1-10; *see also* 277:11-22, 477:21-478:5.  At no point, did Bolger have a "counseling session" with Plaintiff, as required by the Attire Guidelines, to explain what was unacceptable about his attire.  *Id.* at 1057:1-25.[16]  Nor did he ever consider whether the Verizon shirt posed a safety hazard for Plaintiff while he worked in poison ivy, even though the Attire Guidelines provided that "[c]lothing should not create safety hazards for the wearer" and

---

[16] Bolger had been trained on the Attire Guidelines.  *Id.* at 990:15-991:4.

17

required supervisors to "consider the type of work . . . and other job specific criteria when considering what is and is not casual attire appropriate for the business environment." *Id.* at 1054:10-24; Pl. Tr. Ex. 60.

In addition to discussing Abreu with Bolger, Lucas also talked to him about two other employees who he had once seen wearing T-shirts instead of their Verizon shirts. *Id.* at 240:22-241:2. When asked why these two employees, both of whom are Caucasian, were not removed from Fire Island while Plaintiff was, Lucas testified that they had been wearing T-shirts, whereas Abreu had been wearing a tank top, which was never permitted. *Id.* at 241:1-242:17; *see also* Pl. Tr. Ex. 60 (Attire Guidelines listing tank tops as "inappropriate attire."). According to Lucas, Plaintiff was removed from Fire Island not for failing to wear his Verizon shirt, but rather for wearing a tank top. *Id.* at 227:12-228:16, 286:5-12.

Bolger testified that Abreu was removed from Fire Island because he "no longer had confidence that [his] directive was being followed." *Id.* at 995:8-13, 1066:19-25. He went on to explain that "Fire Island is minimally supervised . . . [and] there is a need for everyone who is working over there to be trustworthy and do what they're supposed [to] do and be where they're supposed to be and be dressed as they're supposed to be dressed." *Id.* at 995:14-24. Bolger denied basing his decision to remove Plaintiff on his race or national origin and testified that he had received training on Verizon's anti-discrimination and anti-harassment policies. *Id.* at 1013:9-1014:22, 1019:22-1020:1. Further, Bolger conceded on cross-examination that the decision to transfer Abreu was made by both him and Lucas. *Id.* at 1061:19-1062:22.

Like Bolger and Lucas, Francis also testified that on one occasion—the date or general time period of which he could not recall—he saw Plaintiff without his shirt and talked to him about wearing it. *Id.* at 97:11-98:5. Despite considering that not wearing his Verizon shirt was a "significant infraction," Francis did not discipline Abreu. *Id.* at 113:16-114:11.

### iv.  *Abreu's Request to be Reassigned to Fire Island*

After he was transferred to the Mainland, Plaintiff asked several times to be reassigned back to Fire Island but was "not allowed to even be considered" for a reassignment. *Id.* at 538:2-19. In response to his request, Lucas told Abreu that as long as he and Bolger were managers, Plaintiff would "never go back to Fire Island." *Id.* at 507:1-9, 510:12-24. Lucas denied ever saying this to Abreu. *Id.* at 228:17-20. However, when impeached with his April 2017[17] deposition testimony, Lucas conceded that he had told a union representative, that as long as he was in charge, Plaintiff would never work another day on Fire Island. *Id.* at 228:21-230:6. He later testified that neither the decision to remove Abreu, nor his comment about prohibiting him from returning to Fire Island had anything to do with Plaintiff's race or ethnicity. *Id.* at 354:3-11. Moreover, Lucas explained that he had received training on Verizon's anti-discrimination and anti-retaliation policies. *Id.* at 346:23-352:25.

---

[17] The Court notes that the 2007 date in the Trial Transcript is a clerical error, as depositions for this case were conducted in 2017. *See, e.g., id.* at 61:4-5 (Francis testimony referring to April 2017 deposition); 634:22-635:4 (Abreu testimony referring to February 2017 deposition); 1069:10-14 (Bolger testimony referring to April 2017 deposition).

On July 25, 2012, Plaintiff lodged a formal complaint with the Global Ethics Hotline against Defendants Lucas and Francis,[18] alleging that they had discriminated against him by assigning preferential jobs to Caucasian employees, even though Abreu was more senior. *Id.* at 484:19-485:14, 487:12-25, 658:15-21; Pl. Tr. Ex. 28. By submitting a complaint to the Global Ethics Hotline, Plaintiff followed Verizon's anti-discrimination and anti-harassment policies—summarized on posters in building lobbies, including in the lobby of the Holbrook garage. Tr., 346:23-352:25, 1014:23-1015:11; *see also* Pl. Tr. Ex. 13. Abreu's complaint only referred to his experience on Fire Island and made no mention of Francis's purported harassment on the Mainland. Tr., 658:25-661:24.

The following month, after receiving no response to his July 2012 complaint, Plaintiff followed-up and learned that Verizon had determined that there had been no discrimination. *Id.* at 508:4-19. Abreu filed a second complaint with the State Division of Human Rights on May 13, 2013, in which he also named Bolger. *Id.* at 661:25-662:4; Pl. Tr. Ex. 12. Like the 2012 complaint, Plaintiff's 2013 complaint only referred to his experiences on Fire Island. Tr., 661:25-663:23, 668:2-8.

In August 2012, Lucas and Bolger learned that Abreu had filed a complaint against them, when they were contacted by Verizon's Ethics Department. *Id.* at 252:7-13, 1003:19-24. As far as Bolger knew, this was the first time that Plaintiff had complained about discrimination.[19]   *Id.* at 1015:14-20. Upon learning from the

---

[18] The complaint did not name Bolger. *Id.* at 710:6-14.

[19] Bolger, who had received training on Verizon's employment policies, including on how to maintain an "inclusive, fair and healthy work environment[,]" was aware of Verizon's policies, which

complaint that Abreu's explanation for wearing a tank top was that he had been working in poison ivy, Bolger did not contact anyone to ask how employees generally dealt with poison ivy exposure, despite knowing that poison ivy could be spread through contact with contaminated clothing and should be washed off immediately. *Id.* at 1059:6-1061:13. Lucas admitted that he had been aware of Plaintiff's complaint when he made the determination not to send him back to Fire Island but denied that this knowledge had influenced his decision. *Id.* at 254:23-256:5.

      *v.*    *Effect on Abreu of Transfer from Fire Island to the Mainland*

        1.  <u>Economic Damages</u>

According to Abreu, the main incentive for working on Fire Island was the opportunity for more overtime than on the Mainland. *Id.* at 505:16-506:8. Plaintiff testified that Fire Island employees are paid from when they board the ferry to get from the Mainland to Fire Island each morning, which builds approximately two hours of overtime into each day. *Id.* at 492:7-12. Additionally, there was more work on Fire Island in the early spring than on the Mainland, and because the "overtime list was pretty much open" during that time, employees could work on Saturdays and Sundays. *Id.* at 505:24-506:8. Coworkers Polosino, Moore and Riordan echoed Abreu's testimony regarding overtime. *Id.* at 199:9-24, 392:23-393:10, 940:4-7. According to Moore, employees would "make a lot more [money] . . . probably . . . $20,000 more" by working on Fire Island as opposed to on the Mainland, and even in

---

instructed employees who experienced any harassment or discrimination to report it to their supervisor, human resources or the Verizon ethics hotline. *Id.* at 1013:9-1015:11.

the winter months, employees on Fire Island "always got an hour or two of overtime." *Id.* at 413:2-9, 421:19-25.

According to Plaintiff, when he was removed from Fire Island, he no longer had opportunities for overtime because he was only trained to work on the Copper system on Fire Island and was not trained to work on the Fiber Optics ("FIOS") system that Verizon was installing on the Mainland.  *Id.* at 744:19-24, 818:14-819:13. Abreu testified that he was "not allowed" to participate in the FIOS training program. *Id.* at 744:23-745:8, 818:14-819:13.  He testified that his lost overtime amounted to a loss of approximately $20,000.00 to $40,000.00 in income per year.  *Id.* at 492:1-16, 505:16-506:8, 587:13-593:23, 735:9-12; *see also* Pl. Tr. Ex. 57E (2011 W-2 Form indicating $94,378.00 in wages while working on Fire Island); Pl. Tr. Ex. 57D (2012 W-2 Form indicating $93,391.00 in wages while working on Fire Island); Pl. Tr. Ex. 57C (2013 W-2 Form indicating $57,512.00 in wages after transfer to Mainland); Pl. Tr. Ex. 57B (2014 W-2 Form indicating $55,959.00 in wages after transfer to Mainland).  Riordan similarly experienced a decrease in his overtime payments during the five-month period in which he was not working on Fire Island due to allegations that he had kicked a seal.  *Id.* at 961:21-23.

According to the Individual Defendants, however, there was no difference in pay, overtime or benefits between Fire Island and the Mainland, and working on Fire Island was not more lucrative than working on the Mainland.  *Id.* at 118:6-21, 133:1-134:17, 355:20-23, 357:7-13, 999:13-23.  Bolger, who managed the overtime budget, testified that the overtime on Fire Island and the Mainland was "very similar."  *Id.*

at 999:13-1000:24.  With respect to any changes in Plaintiff's job once he was removed from Fire Island, Bolger testified that everything—his job title, union membership, health insurance, benefits and rules—remained the same as it had been on Fire Island.  *Id.* at 998:19-999:7.  On cross-examination, however, Bolger agreed that the opportunities for overtime on the Mainland came from FIOS work, for which Abreu had not been trained, and that there was "considerably less" opportunity for Copper work, *id.* at 1086:17-1087:14, which is the work that Plaintiff had been doing on Fire Island.  *Id.* at 744:19-24.

### 2. Emotional Distress Damages

After he was removed from Fire Island, Abreu began to experience "[a] lot of anxiety[]" and feeling like he was "somebody else."  *Id.* at 541:19-542:9.  He also began to have trouble sleeping for the first time in his life.  *Id.* at 542:16-543:2.  Plaintiff testified that there were still times when he could not leave his house because he felt afraid.  *Id.* at 543:11-20.  He further specified that whenever he saw a Verizon truck, he felt like he was going to have a heart attack.  *Id.* at 543:16-20.  Further, Abreu testified that, after the transfer off Fire Island, he did not want to see any members of his family and just wanted to be left alone.  *Id.* at 544:4-12, 549:6-23.  His "mind was never clear," and, as a result, his sex life and overall relationship with his wife were no longer the same, and he thought that his relationship would end as soon as their children finished college.  *Id.* at 543:23-544:2, 547:11-23.  Where Plaintiff had previously "been a very strong person[]" who "never liked complaining[]" and upon whom "everyone always depended[,]" he was now "totally [the] opposite[.]"  *Id.* at

23

544:16-25.   He could not concentrate on work and was always looking over his shoulder because he felt like he was always being watched.   *Id.* at 561:4-22. Additionally, Abreu was having recurring nightmares about being at work and "[d]ealing with . . . Francis" on Fire Island, "being harassed [and] being singled out." *Id.* at 609:20-610:12, 612:5-12.   When asked whether he had ever had suicidal thoughts, Plaintiff testified:  "I never thought about killing myself, but the thought came through my mind.  Not of actually doing it, but again, it was thinking, what if one day I lose my mind just like those people I've seen on TV and go shoot a whole bunch of people.  I was afraid of that.  I didn't think about it, but I was—'cause I used to ask myself, what possesses a person to lose their mind that bad and go and shoot up a group of people for no reason and that's when I started to get help." *Id.* at 561:23-562:10.

So, for the first time in his life, Abreu sought therapy, hoping that he could "be normal . . . [and] get back to [himself] so [he] could continue working." *Id.* at 545:20-547:10, 555:13-16.   Plaintiff saw three psychologists at the Institute for Rational Counseling:  Dr. Joseph Stassi and Dr. Geraldine Muscarnere, who had diagnosed him with depression and anxiety and noted "sleeping disturbances and impaired concentration[,]" as well as Dr. Richard Dackow, who was treating Abreu for posttraumatic stress.  *Id.* at 550:2-9, 601:22-606:25, 609:9-12, 838:10-840:13; Pl. Tr. Ex. 48.  He also saw psychiatrist Dr. Enoch Chan.  Tr., 550:2-9, 838:10-18.

Dr. Chan treated Plaintiff for major depressive disorder and anxiety from April 2013 to December 2014.  *Id.* at 841:4-8, 843:25-844:4, 848:22-849:1.  Dr. Chan testified

24

that Abreu complained of depression, "terminal insomnia"—which is caused by high stress and depression—severe anxiety, panic attacks, anhedonia and thoughts of suicide. *Id.* at 844:21-845:7. Plaintiff informed Dr. Chan that his work was the major cause of his anxiety. *Id.* at 845:23-846:13.

In October 2013, Dr. Chan prescribed 10 milligrams once a day of Lexapro. *Id.* at 852:16-853:10. The following month, Dr. Chan increased the Lexapro prescription to 20 milligrams because Abreu had only shown "suboptimal" improvement on the lower dosage. *Id.* at 853:14-854:11. At a follow-up appointment in January 2014, Dr. Chan noted that the 20 milligrams of Lexapro had improved Plaintiff's mood and insomnia and that his anxiety and panic attacks, which had not responded to a lower dosage, were beginning to improve slightly. *Id.* at 854:12-855:6. Dr. Chan then prescribed a mood stabilizer, Lamotrigine, to further improve Abreu's symptoms. *Id.* at 855:7-18.

Dr. Chan testified that by September 2014, after several adjustments to Plaintiff's psychotropic regimen, he was "feeling markedly better." *Id.* at 847:7-14. However, on October 7, 2014, Dr. Chan noted that upon returning to work, Abreu began having panic attacks three to four times a day, which he had not experienced while out of work, and that his sleep was disturbed, he had increased irritability and was feeling "markedly worse." *Id.* at 850:4-24. Accordingly, on October 23, 2014, Dr. Chan wrote a letter recommending that Plaintiff "should avoid working at his current position[]" because his work "causes undue stress and greatly exacerbates anxiety and panic." *Id.* at 848:12-849:11; Declaration of Howard M. Wexler in Support of

Defendants' Motion for Judgment as a Matter of Law, or, in the Alternative, for a New Trial or a Conditional Order of Remittitur ("Def. Decl."), [DE 103], Ex. N. Dr. Chan explained that he wrote this letter because he observed that when Abreu avoided work, his mood and anxiety "markedly" improved and that even with medications, his symptoms returned when he went back to Verizon. Tr., 849:12-20. Accordingly, Dr. Chan concluded that Plaintiff's work was a "major contributor" to his emotional state. *Id.* at 849:21-25. Dr. Chan testified that his interactions with Abreu were consistent with Dr. Dackow's notes that Plaintiff had reported nightmares, intrusive thoughts and "panic attacks due to hostile work environment[.]" *Id.* at 856:1-857:17.

Despite therapy, Abreu was struggling to sleep and finding himself falling asleep at work and stoplights. *Id.* at 555:17-556:8. As a result, and, at his doctors' suggestion, he decided to take disability leave "before [he] caused any harm to [himself] or anyone else." *Id.* In March 2014, Dr. Andrew Elmore—an independent doctor who examined Plaintiff on behalf of Verizon for his worker's compensation claim, *id.* at 564:21-566:25—noted Abreu's complaints of "continuous painful ruminations over the events that led to his being forced to stop working at his job of 27 years, inability to sleep due to anxiety and panic over the situation with his employer, chest pains that make him feel like he is having a heart attack that wake him up several times every night, and impaired sexual functioning[]" as well as feeling "psychologically overwhelmed by this situation." *Id.* at 858:16-859:16; Def. Decl., Ex. O. He diagnosed Plaintiff with post-traumatic stress disorder and

determined that there was a causal relationship between Abreu's post-traumatic stress disorder and work-related events.  Tr., 571:6-12; Def. Decl., Ex. O.  After approximately four to six months of disability leave, Plaintiff returned to work.  Tr., 556:16-20.  However, his anxiety and stress returned, and he "realized [he] just couldn't stay . . . at this job anymore." *Id.* at 556:19-557:9.  Accordingly, Abreu retired around December 2014.  *Id.* at 541:12-18, 556:19-557:9, 593:24-594:2.

## B. <u>Rule 50(a) Motion and the Verdict</u>

On March 20, 2019, after Plaintiff had rested his case, Defendants moved for a directed verdict under Fed. R. Civ. P. 50(a).  *Id.* at 877:5-19.  The Court reserved judgment until after Defendants had presented their case, *id.* at 930:8-24, after which it granted Defendants' motion with respect to Abreu's hostile work environment claim, constructive discharge claim and retaliation claim only with respect to Francis. *Id.* at 1128:14-1139:3.  Accordingly, the Court charged the jury only on Plaintiff's federal and state law discrimination claims against Defendants and federal and state law retaliation claims against Verizon, Lucas and Bolger.  *Id.* at 1290:4-1300:6.  After one day of deliberations, the jury returned a verdict.  *Id.* at 1307:3, 1338:3-5.  It found that Verizon was liable for discrimination under federal and state law, that Francis was personally liable under federal and state law, that Lucas was liable only under state law and that Bolger was not individually liable under either federal or state law.  Def. Decl., Ex. P, 2-3.  The jury further found that Verizon was liable for retaliation under federal and state law, that Lucas was individually liable under federal and state law and that Bolger was not individually liable.  *Id.* at 3-4.  The jury

awarded Abreu $55,000.00 in actual damages, $750,000.00 in compensatory damages and $1,850,000.00 in punitive damages. *Id.* at 4-5.

Defendants now move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50, or, in the alternative, pursuant to Fed. R. Civ. P. 59, for a new trial or for remittitur of the damages award.

## II.   LEGAL STANDARDS

### A.   <u>Motion for Judgment as a Matter of Law Under Fed. R. Civ. P. 50</u>

Under Rule 50, a court may not grant a motion for judgment as a matter of law "unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in [its] favor." *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 50(a)(1). A court reviewing a Rule 50 motion may not make credibility determinations or weigh the evidence. *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001) (citation omitted). Rather, the court must defer to the credibility determinations and reasonable inferences that the jury may have drawn in reaching its verdict. *Houston v. Cotter*, 07-cv-3256, 2016 WL 1253391 *1 (E.D.N.Y. Mar. 30, 2016) (citation omitted). Accordingly, the motion may be granted only where there is such a total lack of evidence that the verdict could only be the result of "sheer surmise and conjecture," or the evidence in favor of the movant is so overwhelming that a fair-minded person could not have returned a verdict against it. *Weather v. City of Mount Vernon*, 474 Fed. App'x 821, 822-23 (2d Cir. 2012) (citation omitted). Courts should grant Rule 50 motions "cautiously and sparingly," *Meloff*, 240 F.3d at 145 (internal

28

quotation marks and citation omitted), and thus, movants bringing such motions bear a "heavy" burden. *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011).

### B. Motion for New Trial Under Fed. R. Civ. P. 59

Rule 59 provides that a court may grant a new trial in a jury case for any of the reasons "for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Accordingly, a court may, in its discretion, grant a new trial where the jury's verdict is contrary to the weight of the evidence. *Crews v. County of Nassau*, 149 F. Supp. 3d 287, 292 (E.D.N.Y. 2015) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998)). The standard governing a court's consideration of a Rule 59 motion is "notably more flexible" than that for a Rule 50 motion because a court considering a Rule 59 motion need not view the verdict in the light most favorable to the nonmoving party, and it may grant the Rule 59 motion even if there is "substantial evidence" supporting the verdict. *Jennings v. Yurkiw*, No. 14-cv-6377, 2018 WL 5630454, at *5 (E.D.N.Y. Oct. 31, 2018) (citation omitted); *DLC Mgt. Corp.*, 163 F.3d at 134; *Crews*, 149 F. Supp. 3d at 293. Nevertheless, a new trial should not be granted unless the court is convinced that the jury "reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018) (internal quotation marks and citation omitted); *see also DLC Mgt. Corp.*, 163 F.3d at 134 ("[T]he court should only grant such a motion when the jury's verdict is egregious.") (internal quotation marks and citation omitted). Further, where the verdict depended on the credibility of the witnesses, the court should refrain from setting the verdict aside in favor of a new

trial. *Raedle v. Credit Agricole Indosez*, 670 F.3d 411, 418 (2d Cir. 2012) ("[W]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.") (internal quotation marks and citation omitted); *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d Cir. 1992) ("[W]e caution that the jury is empowered and capable of evaluating a witness's credibility, and this evaluation should rarely be disturbed.").

### C. <u>Motion for Remittitur Under Fed. R. Civ. P. 59</u>

Where a court finds a damage verdict to be excessive, it may grant remittitur, which is "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (internal quotation marks and citation omitted). Remittitur is warranted "only in cases 'in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award.'" *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 559 (S.D.N.Y. 2012) (quoting *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1027 (2d Cir. 1991)). Thus, a remittitur is, in effect, "'a statement by the court that it is shocked by the jury's award of damages.'" *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 327 (S.D.N.Y. 2016) (quoting *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990)). In determining whether an award "is so high as to shock the judicial conscience," the court considers the damages awarded in "other, comparable cases."

*DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) (internal quotation marks and citations omitted).

## III.  DISCUSSION

### A.  Rule 50(b) Motion for Judgment as a Matter of Law

Initially, Defendants move for judgment as a matter of law pursuant to Rule 50(b), arguing that the evidence presented at trial was insufficient to permit a reasonable juror to find Verizon, Lucas and Francis liable for discrimination or to find Verizon and Lucas liable for retaliation.  *See* Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law, or, in the Alternative, a New Trial or a Conditional Order of Remittitur ("Def. Memo"), DE [104], 3-11.  Because the Court finds that the evidence at trial, viewed in the light most favorable to Plaintiff, was sufficient to sustain the jury's verdict, the motion is denied.

#### i.  *Discrimination*

In evaluating Defendants' motion for judgment as a matter of law, the Court must determine whether Abreu could satisfy his "'ultimate burden'" of persuading the jury that Verizon, Lucas and Francis intentionally discriminated against him. *See Lewis v. Am. Sugar Ref., Inc.*, 325 F. Supp. 3d 321, 349 (S.D.N.Y. 2018) (quoting *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000)).  Thus, the Court must determine whether a reasonable jury could have concluded that Plaintiff sufficiently put forth a *prima facie* case of discrimination, and whether it was reasonable for the jury not to believe Verizon's, Lucas's and Francis's proffered explanation for their alleged discriminatory conduct.  *See id.* (citation omitted); *see also Cross v. New York*

*City Transit Auth.*, 417 F.3d 241, 249 (2d Cir. 2005) ("[W]hether judgment as a matter of law is appropriate in any particular case depends on a careful review of the total evidence adduced, including the strength of the plaintiff's prima facie case [and] the probative value of the proof that the employer's explanation is false[.]") (internal quotation marks and citation omitted).[20]   Applying these principles, the Court concludes that the trial evidence was sufficient to support the jury's finding of discrimination.

The jury found Verizon liable for discrimination under Title VII, § 1981 and the NYSHRL, Francis liable under § 1981 and the NYSHRL and Lucas liable only under the NYSHRL.  Def. Decl., Ex. P., 2-3.  Claims brought under Title VII, § 1981, and the NYSHRL are all analyzed under the same standard.  *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 553 (S.D.N.Y. 2014) (citation omitted).  To state a claim for race discrimination, Abreu had to establish that: "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered from an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination."  *Mazyck v. Metro.*

---

[20]  In evaluating motions for judgment as a matter of law in discrimination and retaliation actions, courts are guided by the three-step *McDonnell Douglas* analysis, under which a plaintiff must initially make out a *prima facie* case of discrimination, the burden then shifts to the defendant to articulate a non-discriminatory reason for the challenged conduct and finally plaintiff must show by a preponderance of the evidence that the proffered reasons is merely pretext for discrimination.  *Cross*, 417 F.3d at 248.  Although the Court bears this framework in mind, it notes that the jury was not and should not have been instructed on burden-shifting.  *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 118 (2d Cir. 2000) ("[T]rial judges should not import uncritically language used in the traditional *McDonnell Douglas* formulation into jury charges because such language—developed by appellate courts for use by judges—is at best irrelevant, and at worst misleading to a jury.") (internal quotation marks, citation and alterations omitted).

*Transp. Auth.*, 893 F. Supp. 2d 574, 587 (S.D.N.Y. 2012) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  With respect to the first two elements, Defendants do not dispute that, as a Black Hispanic individual, Plaintiff is a member of a protected class, nor do they assert that, after 27.5 years of employment, he was not qualified for his position as a Verizon technician.  Defendants argue, however, that Abreu did not suffer from an adverse employment action and that there was no legally sufficient proof of discrimination.  Def. Memo, 3-8.

An employer's action toward an employee constitutes an adverse employment action where it is "materially adverse with respect to the terms and conditions of employment." *Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (internal quotation marks and citation omitted).  Although there exists no bright-line rule for determining whether a challenged employment action can serve as the basis for a discrimination claim, the action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.* (citations omitted).  A reassignment that results in lost overtime or inferior work conditions may constitute an adverse employment action.  *Faggiano v. Eastman Kodak Co.*, 378 F. Supp. 2d 292, 306 (W.D.N.Y. 2005) (holding that plaintiff suffered adverse employment action when he lost overtime opportunities); *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (holding that evidence of loss in income due to lost overtime amounts to adverse employment action)*; see also Patrolmen's Benevolent Ass'n. of City of New York v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002) ("A lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment

action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way.") (citations omitted).

Here, there was sufficient evidence that Plaintiff suffered an adverse employment action as a result of inferior work conditions when Francis reassigned him from Zone 3 to Zone 1. Defendants argue that this reassignment amounts to nothing more than "subjective disappointment" which does not meet the objective criteria of an adverse employment action. Def. Memo, 4, n.4. A "reassignment of job duties is not automatically actionable[,]" and whether a particular reassignment is materially adverse "should be judged from the perspective of a reasonable person in plaintiff's position, considering all the circumstances." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71, 126 S.Ct. 2405, 2417 (2006) (internal quotation marks and citation omitted); *see also Mitchell v. SUNY Upstate Med. Univ.*, 243 F. Supp. 3d 255, 278 (N.D.N.Y. 2017), *aff'd sub nom. Mitchell v. State Univ. of New York Upstate Med. Univ.*, 723 F. App'x 62 (2d Cir. 2018) ("Material adversity is to be determined objectively based on the actions of a reasonable employee in both discrimination and retaliation claims.") (citations omitted). Here, the jury heard evidence that working conditions in Zone 1 were more difficult than in Zones 2 and 3. Abreu testified that Zone 1 "was the worst" to work in because there, employees were required to climb poles covered in poison ivy and ticks, while the work in Zones 2 and 3 was easier because the poles were at ground level. Tr., 464:1-12. Further, in Zone 1, Plaintiff only had access to a bicycle, which made it difficult to get around, especially in inclement weather. *Id.* at 486:17-487:1. Polosino similarly testified that Zone 1 was

34

"probably the worst" area to work in, and Riordan also considered Zones 2 and 3 to be the preferable areas in which to work.  *Id.* at 176:6-178:4, 942:25-943:3, 945:12-24. Further, there was no dispute that while Zones 2 and 3 had break areas with bathrooms, refrigerators and couches, Zone 1 only had a small shed without a bathroom.  *Id.* at 84:4-85:4, 406:11-408:3, 463:14-25, 941:6-18, 945:3-20.  Based on this record, a jury could reasonably conclude that the reassignment to Zone 1 "would have been materially adverse to a reasonable employee."  *See Burlington*, 548 U.S. at 70-71, 126 S.Ct. at 2416-17 (jury could reasonably conclude that reassignment of duties "within the same job description" could amount to adverse employment action, where new duties were "more arduous and dirtier" than previous duties).

Further, there was sufficient evidence that Abreu suffered an adverse employment action as a result of lost overtime when he was transferred from Fire Island to the Mainland.  Plaintiff testified that there was more work on Fire Island than on the Mainland and that he lost approximately $20,000.00 to $40,000.00 in income when he was removed, Tr., at 492:1-16, 505:16-506:8, and this testimony was corroborated by Abreu's coworkers and tax returns.  *Id.* at 413:2-9, 421:19-25 (Moore estimating that employees made approximately $20,000.00 more by working on Fire Island as opposed to on the Mainland and that employees received more overtime on Fire Island than on the Mainland even during winter months); 199:9-24 (Polosino testifying that employees who work on Fire Island usually received more overtime than those who work on the Mainland); 940:4-7, 961:12-23 (Riordan testifying that working on Fire Island provided an opportunity to earn more money and that during

the five months in which he was not working on Fire Island, his overtime payments had been effected).  Defendants contend that the W-2 Forms Plaintiff offered to show the decrease in overtime payments was not "competent proof of his overtime at any time" and that the only competent evidence on the issue of overtime came from Bolger, because he was responsible for managing the overtime budget on Fire Island. Def. Memo, 4-5; *see also* Tr., 1000:2-25.  The fact that Defendants deny that Fire Island offered more overtime opportunities, *see, e.g.*, Tr., 118:6-21, 134:2-17, 355:20-357:13, is insufficient to set aside the verdict, in light of all the contrary evidence. *See Theodat v. City of N.Y.*, No. 16-cv-3977, 2019 WL 4385794, at *2 (E.D.N.Y. Sept. 13, 2019) ("If a jury credits one party's version of events over another party's version, its finding should not be disturbed unless the credited version is 'patently incredible or defies physical realities.'") (quoting *U.S. v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  Indeed, Defendants were motivated to deny that Fire Island had greater overtime opportunities, a factor which the jury was entitled to consider in determining whether their testimony on this point was credible. Tr., 1283:14-1284:19 (Jury instructions to "carefully scrutinize all of the testimony given, the circumstances under which each witness testified, and every matter in evidence that tends to show whether a witness is worthy of belief [including] . . . [whether] the witness [has] some incentive, loyalty or motive that might cause the witness to shade the truth" and to consider whether the witness may be "influenced by any bias").  As to Defendants' argument that Abreu chose not to take overtime while on the Mainland and thus, any purported lost overtime would not constitute an adverse

action "as to him," Def. Memo, 6, there was sufficient evidence submitted that the reason that Plaintiff did not take overtime on the Mainland was because whatever available overtime existed was for FIOS work, for which he had not been, and was "not allowed" to be, trained.  Tr., 744:19-745:8, 818:14-819:13, 1086:17-1087:14.

Accordingly, based on the evidence, the jury could reasonably conclude that Abreu suffered an adverse employment action both when Francis reassigned him from Zone 3 to Zone 1 and when Lucas transferred him from Fire Island to the Mainland.

With respect to the fourth element necessary to establish a *prima facie* case, a plaintiff may raise an inference of discrimination by showing that his employer "treated him less favorably than a similarly situated employee outside of his protected group." *Mazyck*, 893 F.Supp. 2d at 587 (citing *Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324, 335, 97 S.Ct. 1843 (1977)).  Because "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent[,]" a victim of discrimination is generally "constrained to rely on the cumulative weight of circumstantial evidence." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 834 (S.D.N.Y. 2013) (citing *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).  Here, the jury heard evidence from which it could reasonably conclude that Verizon, Francis and Lucas unlawfully treated Plaintiff less favorably than his Caucasian coworkers.  According to Abreu, when Francis supervised him on the Mainland, he gave Plaintiff more work than he assigned to Caucasian coworkers and applied certain rules to him that he did not

enforce with Abreu's Caucasian peers.[21]   Tr., 443:24-448:11.   While Francis categorically denied Plaintiff's version of events, the Court defers to the jury's credibility determinations.   *See Houston*, 2016 WL 1253391 *1.  As to Abreu's time on Fire Island, Plaintiff and his coworkers, Polosino and Moore, testified that Abreu was the only employee to consistently wear his Verizon shirt, while most other employees regularly failed to wear their shirts.   Tr., 181:14-182:25, 397:8-398:8, 401:14-24, 459:4-24.  Even Francis and Lucas conceded that they had seen employees without their Verizon shirts on multiple occasions.   *Id.* at 86:16-87:16, 211:25-212:20, 293:1-295:6.  They further conceded that they had each seen Plaintiff without a shirt on only one occasion.   *Id.* at 144:12-14, 230:7-12.  Yet, Abreu was the only employee to be removed from Fire Island for not wearing his Verizon shirt.   *Id.* at 87:21-23, 89:2-24, 215:12-18, 399:15-25, 952:7-14.  Accordingly, the jury could reasonably infer discrimination based on evidence that Plaintiff was the only non-Caucasian employee on Fire Island and also the only employee to be disciplined for a dress-code infraction to which supervisors generally turned a blind eye.

Defendants argue that the jury's finding of discriminatory intent was not reasonable because each of Abreu's allegations was explained by a legitimate, non-discriminatory reason.   Specifically, with respect to Plaintiff's reassignment from Zone 3 to Zone 1,  Francis testified that he reassigned most employees working in

---

[21] Aside from an unsubstantiated passing remark that evidence regarding Francis's purported harassment of Abreu in 2005 "should have been excluded as irrelevant and unduly prejudicial," Defendants fail to explain how this evidence prejudiced them.   *See* Def. Memo, 7.  Absent new arguments, the Court will not re-evaluate the admissibility of this evidence after already having denied Defendants' *motion in limine* to exclude such evidence.   *See* DE [66].

Zone 3, not just Abreu, because he and Lucas hoped to curb employee vandalism that had been occurring in Zone 3. *Id.* at 135:21-136:15. As to why Plaintiff was removed from Fire Island, Defendants cited dress code infractions.[22] *Id.* at 227:12-228:16, 995:2-24, 1066:19-25.

"On a motion for judgment as a matter of law, the court will credit testimony favorable to the movant, if that testimony was not impeached or contravened." *Lewis*, 325 F. Supp. 3d at 353 (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 2110 (2000)). Here, however, not only was the testimony offered by Defendants contravened, but it also failed to amount to such "overwhelming" evidence such that a reasonable juror could not have returned a verdict against them. *See id.* (citation omitted); *see also Cross*, 417 F.3d at 251 (affirming denial of defendants' motion for judgment as a matter of law where defendants had failed to offer "abundant and uncontroverted independent evidence" showing that no discrimination had occurred).

As an initial matter, Polosino, Moore, and Riordan all testified that they knew Plaintiff to be Hispanic and the only non-Caucasian employee on Fire Island. Tr., 183:10-16; 398:9-22; 952:18-953:2. Moreover, the jury itself saw Abreu's dark skin and heard his accent. Accordingly, the jury could reasonably reject the Individual Defendants' testimony that they had not known, prior to Plaintiff's lawsuit, that he was anything other than Caucasian. *Id.* at 59:21-62:18, 241:7-15, 1042:3-7.

---

[22] Although Francis also testified that Abreu violated a rule when he was caught driving several miles away from his job site, *see id.* at 125:11-127:1, Defendants did not otherwise rely on this purported violation in their decision-making.

Moreover, after hearing the Individual Defendants deny something as obvious as Abreu being Hispanic, the jury could reasonably find that they lacked credibility on every other matter.  *Id.* at 1285:3-10 (Court's instructions to jury that it "may disregard the witness's entire testimony as not worthy of belief[]" if it finds that any statement made by that witness is false).

With respect to Plaintiff's reassignment from Zone 3 to Zone 1, the jury could reasonably conclude that Francis reassigned Abreu out of discriminatory animus, rather than for the purported reason of trying to stop the vandalism in Zone 3. Plaintiff testified that "everybody knew" that, while he was the manager on Fire Island, Francis focused his attention on Abreu, and consequently, Plaintiff was held to higher standards than his Caucasian coworkers.  *Id.* at 455:5-456:7, 458:3-20. Further, the jury heard that when Abreu asked Francis why he had been reassigned to Zone 3, Francis replied that he was going to make sure he would be removed from Fire Island.  *Id.* at 482:6-16.  A finding of discriminatory animus is further supported by Francis's hesitancy to recall assigning Plaintiff to Zone 1, *id.* at 85:5-86:1, even though there was no dispute that he was responsible for Zone assignments on Fire Island.  *Id.* at 74:24-75:2.

The jury also heard evidence from which it could reasonably discredit Defendants' explanation regarding Abreu's removal from Fire Island.  Although Defendants claim that Plaintiff was reassigned from Fire Island because he was seen without a Verizon shirt on two occasions, the jury was entitled to credit testimony that the dress code on Fire Island "wasn't really enforced" when Abreu worked there

and, even after Plaintiff's removal, that it remained "lightly enforced." *Id.* at 397:8-398:8. While other Caucasian employees regularly failed to wear their Verizon shirts, Abreu was the only employee to consistently wear his shirt. *Id.* at 181:19-182:25, 397:8-398:8, 401:17-24, 458:21-459:24. Indeed, the Individual Defendants had known of, at most, three occasions on which Plaintiff had not worn his Verizon shirt. *Id.* at 144:12-14, 230:7-12, 984:11-25. One such occasion was during Abreu's lunch break, *id.* at 984:4-10, a time during which, as the Individual Defendants admitted, employees were not being paid and therefore allowed to do whatever they wanted, which included wearing tank tops. *Id.* at 106:21-25, 218:17-20, 1052:2-1053:8. On a second occasion when Plaintiff wore a tank top, he had been working in poison ivy, *id.* at 490:18-491:7, which, as his coworkers corroborated, Abreu did frequently because he was not allergic to poison ivy. *Id.* at 186:2-187:7, 400:11-401:13, 424:17-21, 461:5-21. By wearing a tank top while working among poison ivy and then washing his body and clothes with soap and water, Plaintiff was following the safety protocol prescribed in the Verizon-issued safety brochure. *See* Pl. Tr. Ex. 61; Tr.*, 811:11-813:18. With respect to the final occasion, Francis could not recall a single detail. Tr., 97:11-98:5.

Further, despite Verizon's Attire Guidelines providing that supervisors were to conduct "counseling sessions" to discuss dress code infractions with subordinates, Lucas never counseled Abreu that he could face discipline for failing to comply with the dress code. *Id.* at 287:14-288:4, 295:20-298:8; *see also* Pl. Tr. Ex. 60. Nor did he consider whether a tank top was more appropriate attire than a Verizon shirt to work

in poison ivy, even though the Attire Guidelines provided that "[c]lothing should not create safety hazards for the wearer[]" and supervisors should "consider the type of work . . . and other job specific criteria" when determining what attire is appropriate for an employee. *See* Pl. Tr. Ex. 60; Tr., 237:25-238:8.

Moreover, and likely most compelling to the jury, Defendants admitted that dress code infractions of Caucasian employees, including failure to wear the Verizon shirts or appropriate shoes and safety gear, went unpunished. Tr., 86:13-87:23, 89:2-21, 215:12-18, 293:1-295:9, 400:1-6, 410:22-412:2, 458:21-459:12. The only employees who had been removed from Fire Island had committed infractions far more serious than Plaintiff—leaving work early, disregarding work orders, failing to comply with OSHA regulations regarding footwear, sunbathing on the roof of the Central Office and kicking a seal on the beach. *Id.* at 114:18-116:10, 148:15-24, 323:4-22, 325:20-327:6, 371:6-372:6, 934:19-937:17. Based on this record, the jury could have reasonably found that Abreu's race was a motivating factor in Verizon's and Lucas's decision to remove him from Fire Island.

Finding that Plaintiff carried his ultimate burden of persuading the jury that Francis was motivated by discriminatory animus when he reassigned Abreu from Zone 3 to Zone 1 and that Verizon and Lucas were similarly motivated when they removed Plaintiff from Fire Island, the Court denies Defendants' motion for judgment as a matter of law on Abreu's discrimination claim.

*ii.   Retaliation*

The jury further found Verizon liable for retaliation under Title VII, § 1981 and the NYSHRL and Lucas liable for retaliation under § 1981 and the NYSHRL. *See* Def. Decl., Ex. P, 3-4.  To establish a *prima facie* retaliation claim, the plaintiff must show:  "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also McMenemy v. City of Rochester*, 241 F.3d 279, 283 n.1 (2d Cir. 2001) (noting that analysis of retaliation claims is the same under both federal and state law) (citation omitted).  "[W]hen a retaliation case does go to the jury, the jury's task is simply to determine the ultimate question of whether the plaintiff met [his] burden of proving that the defendant was motivated by prohibited retaliation[.]" *Gordon*, 232 F.3d at 116 (internal quotation marks, citation and alterations omitted).

The first two elements of Plaintiff's prima facie case are undisputed.  After he was removed from Fire Island, Abreu participated in a "protected activity" by filing a complaint with the Global Ethics Hotline. Tr., 484:19-485:14, 658:15-21; Pl. Tr. Ex. 28.  To satisfy the knowledge requirement, Plaintiff was required to establish nothing more than "general corporate knowledge"—meaning that he only had to show that Verizon was aware of his complaint, which, in light of Verizon's investigation of his complaint, is undisputed.  *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 147-48 (2d Cir. 2010) (citation omitted).  Nonetheless, the jury also heard evidence regarding

43

Lucas's knowledge of Abreu's complaint.  Lucas admitted that he had told a union representative that Plaintiff would never return to Fire Island, Tr., 228:21-230:6, and that he had been aware of Abreu's complaint with the Global Ethics Hotline when he made the determination not to send him back to Fire Island.  *Id.* at 254:23-256:5.  The jury was entitled to discredit Lucas's testimony that his decision had not been influenced by Plaintiff's complaint.  *Id.* at 255:25-256:5.

With respect to the third element—adverse employment action—Defendants argue, without citing any supporting authority, that the decision not to send Abreu back to Fire Island does not constitute an adverse action because it "is tantamount to claiming that following a demotion, the decision not to promote is in retaliation for complaining about the demotion[.]"  Def. Memo, 8.  An adverse employment action in the context of a retaliation claim "covers a broader range of conduct than does the adverse-action standard for claims of discrimination . . ." and constitutes "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (internal quotation marks and citation omitted).  Contrary to Defendants' contention, a retaliation claim can be based on an employer's refusal to promote. *Terry v. Ashcroft*, 336 F.3d 128, 142 (2d Cir. 2003); *Martin v. State Univ. of New York*, 704 F. Supp. 2d 202, 232 (E.D.N.Y. 2010) (denying defendants' motion for summary judgment on plaintiff's retaliatory denial of promotion claim, where claim rested entirely on credibility of defendant).  In this regard, Abreu testified that he asked to be transferred back to Fire Island, and his request was denied.  Tr., 538:2-19, 734:6-

735:5.  The fact that Plaintiff made "only an informal request" rather than filing a grievance, Def. Memo, 8-9, does little to convince the Court that the refusal to transfer him back to Fire Island does not constitute an adverse employment action.

Finally, with respect to the fourth element—causal connection, Defendants dispute that the decision not to reassign Abreu to Fire Island was in response to his complaint.  To establish causal connection, a plaintiff must "plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action."  *Vega*, 801 F.3d at 90 (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S.Ct. 2517, 2533 (2013)).  "But-for causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."  *Id.* at 91 (internal quotation marks, citation and alterations omitted).   "[W]eaknesses, implausibilites, inconsistencies, or contradictions in [an] employer's proffered legitimate, nonretaliatory reasons for its action[]" may establish that retaliation was a "but-for" cause of an adverse employment action.  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (citations omitted).  Further, the plaintiff must establish that his protected activity was "followed closely in time by adverse employment action."  *Vega*, 801 F.3d at 90 (citations omitted).  Courts in this Circuit have found as much as five months between a protected activity and an adverse employment action sufficient to establish a temporal relationship.  *Zann*, 737 F.3d at 845 (citation omitted).

According to Defendants, the reason Plaintiff was never sent back to Fire Island was because, as a matter of policy, they would not send employees back after they had been removed.  Tr., 353:18-354:2, 1008:8-10.  However, two Caucasian employees, Labuda and Riordan,[23] were allowed to return to Fire Island after being removed for leaving work early and kicking a seal, respectively.  *Id.* at 114:18-116:10, 368:5-369:7, 937:12-17.  Based on the inconsistency between Defendants' testimony and their actions regarding reassignments to Fire Island, the jury could reasonably conclude that the decision not to reassign Abreu back to Fire Island would not have occurred absent a retaliatory motive.   Further, Plaintiff established temporal proximity between his protected activity and the adverse employment action.  Lucas told the union representative that Abreu would not return to Fire Island in August 2012, less than one month after Plaintiff had filed his complaint.  *Id.* at 228:21-230:7, 252:7-13.

Accordingly, Defendants' motion for judgment as a matter of law as to Plaintiff's retaliation claims is denied.

### B. **Rule 59 Motion for a New Trial**

Defendants next move, pursuant to Rule 59, for a new trial on the grounds that:  (1) the verdict was against the weight of the evidence; (2) Abreu's counsel made

---

[23] Defendants' argument that it was error for the Court to allow testimony about Riordan after Judge Wexler's decision to exclude such testimony from the original 2017 mistrial is without merit. Def. Memo, 9.   While the law of the case doctrine provides that "a court should not ordinarily reconsider, disturb or overrule an order in the same action of another court of co-ordinate jurisdiction . . . an evidentiary type ruling will normally not be binding in a subsequent trial." *Aviles v. Capra*, No. 13-cv-1153, 2014 WL 4805036, at *9 (E.D.N.Y. Sept. 26, 2014) (internal quotation marks and citations omitted) (finding that first trial court's decision regarding admission of evidence provided no basis on which to challenge its admission in the second trial).

several improper statements during summation, and the Court improperly sustained Plaintiff's counsel's objection during Defendants' summation; and (3) the jury improperly considered evidence of the dismissed claims. Def. Memo, 11-18.

   i. *Weight of the Evidence*

Defendants first argue that they are entitled to a new trial because the jury's verdict was against the weight of the evidence. Although they do not explain why, Defendants are seemingly incredulous of a verdict finding not liable "Bolger, Plaintiff's second line supervisor, who made the decision to reassign Plaintiff to the Mainland" while finding liable "the company . . . [and] Francis, who was gone prior to the decision, and Lucas, who was subordinate to Bolger and only spoke with Plaintiff once." Def. Memo, 11.

It is the province of the jury to consider the parties' arguments and resolve conflicting evidence. *Mangino v. Inc. Vill. of Patchogue*, No. 06-cv-5716, 2014 WL 3795572, at *5 (E.D.N.Y. Aug. 1, 2014), *aff'd on other grounds*, 808 F.3d 951 (2d Cir. 2015). Thus, courts should generally not "intrude upon the jury function of credibility assessment." *Theodat*, 2019 WL 4385794, at *2 (internal quotation marks and citation omitted). Where conflicting accounts of witnesses are equally plausible, and there is no independent evidence in the trial record demonstrating that one party's witnesses should not be believed, the trial judge should accept the jury's findings, irrespective of any doubts he may have on the matter. *Ricciuti v. New N.Y.C. Transit Auth.*, 70 F. Supp. 2d 300, 308 (S.D.N.Y. 1999). Conversely, where the jury credits a version of events that is "patently incredible or defies physical realities[,]" the court

should disturb the jury's verdict.  *Theodat*, 2019 WL 4385794, at *2  (quoting *Sanchez*, 969 F.2d at 1414).

The jury's verdict was not seriously erroneous and does not constitute a miscarriage of justice.  As discussed above, the jury made reasonable credibility determinations.  In fact, and as set forth above, the jury could have reasonably rejected all of Defendants' testimony by concluding that their testimony that they did not know that Plaintiff was Black Hispanic, given his name, accent and skin color, was wholly untruthful.

### ii.  *Summations*

Defendants next contend that improper conduct of the Court and inflammatory conduct by Abreu's counsel during summations denied them a fair and impartial trial. Def. Memo, 12-16.  Specifically, Defendants argue that:  (1) the Court improperly sustained Plaintiff's counsel's objection to Defendants' summation; (2) Abreu's counsel attempted to impute racism to Defendants by improperly referencing Defense counsel's conduct during trial and thus inflaming the jury; and (3) Plaintiff's counsel improperly argued about an inapplicable provision of the collective bargaining agreement governing inter-area transfers on Fire Island, rather than the applicable provision governing intra-area transfer.  *Id*. at 12-16, 18.

As an initial matter, "when arguing to a jury, counsel must properly have some latitude, so long as prejudice does not appear."  *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 155 (E.D.N.Y. 2013) (quoting *Schwartz v. Nw. Airlines, Inc.,* 275 F.2d 846, 846 (2d Cir.1960)).  Therefore, "[n]ot every improper

or poorly supported remark made in summation irreparably taints the proceedings[,]"
and a new trial should be granted "only if counsel's conduct created undue prejudice
or passion which played upon the sympathy of the jury[.]" *Marcic v. Reinauer Transp.
Cos.,* 397 F.3d 120, 127 (2d Cir. 2005) (internal quotation marks and citation
omitted); *see also Parrish v. Sollecito*, 280 F. Supp. 2d 145, 168 (S.D.N.Y. 2003) ("A
new trial is only warranted where the attorney's concluding argument deprived the
opposite party of a fair trial.") (quoting *Mileski v. Long Island R.R. Co.*, 499 F.2d 1169,
1171 (2d Cir. 1974)).  Undue prejudice exists where "there is a reasonable probability
that the jury's verdict was influenced by the improper conduct of counsel." *Parker v.
Bulik*, No. 11-cv-5412, 2017 WL 3396440, at *21 (E.D.N.Y. Aug. 5, 2017) (internal
quotation marks and citations omitted).  Whether remarks made during summation
warrant a new trial is a question within the trial court's broad discretion.
*See Malmsteen v. Berdon, LLP*, 595 F. Supp. 2d 299, 309 (S.D.N.Y. 2009), *aff'd*, 369
F. App'x 248 (2d Cir. 2010) (citation omitted).  This is because the trial court holds a
"superior vantage point when evaluating the possible impact of the alleged prejudicial
conduct" since a "printed record is unable to replicate in full all the circumstances—
for example, tones of voices, demeanor of witnesses and jurors and the like—that
occur in the course of an unfolding trial." *Claudio*, 955 F. Supp. 2d at 158 (quoting
*Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992)); *Johnson v.
Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir. 1990) ("Great discretion is to be given [to]
the judge who was present throughout the trial and is best able to determine the
effect of the conduct of counsel on the jury.") (citation omitted).  In assessing the

impact of allegedly improper comments by counsel during summation, "a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (*e.g.*, whether it is a close case), and the verdict itself." *Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457, 471-72 (S.D.N.Y. 2003) (quoting *Forrestal v. Magendantz*, 848 F.2d 303, 309 (1st Cir. 1988)); *see also Parrish*, 280 F. Supp. 2d at 168 ("A court should examine the propriety of a closing argument by reviewing the entire argument within the context of the court's rulings on objections, the jury, and any corrective measures applied by the trial court.") (internal quotation marks and citation omitted).  Further, where "the complaining party fails to object at trial to statements made during summation, the court will only grant a new trial when the error is so serious and flagrant that it goes to the very integrity of the trial." *Claudio*, 955 F. Supp. 2d at 156 (internal quotation marks and citation omitted).

Having participated in the trial, and with a full understanding of the evidence presented, the Court finds Defendants' arguments to be without merit.  Setting aside the fact that Defendants never objected to Plaintiff's summation, Tr., 1179:11-1216:20, Defendants do not show, nor does the record reflect, that Abreu's counsel's remarks during summation, including his objection during Defendants' summation, caused prejudice to Defendants.  To the extent Defendants argue that Plaintiff's counsel mischaracterized the evidence, the Court instructed the jury that statements

of an attorney in summation and throughout trial are not evidence. *Id.* at 8:6-14 ("Upon completion of the introduction of evidence, the attorneys will again address you in a closing statement or what we call summations. In summing up, the attorneys will point out to you what they contend the evidence has shown, what inferences they believe you should draw from the evidence introduced, and what conclusion they believe you should reach in your verdict. What is said by the attorneys in their summations is not evidence."); *see also id.* at 1280:14-22 ("What I say to you in these instructions is not evidence. Neither were any of the statements made by the lawyers during the trial, nor any questions posed by them unless the question was adopted by a witness . . . . It is your recollection of the evidence that governs your determinations.").

Nonetheless, the Court addresses each of Defendants' arguments in turn. First, Defendants argue that Abreu's counsel improperly objected when Defendants' counsel recounted Plaintiff's testimony that Francis was "a racist." Def. Memo, 12-14. According to Defendants, they had been trying to point out that the only evidence of racial discrimination had come not from witness testimony but from Abreu's "name calling," but were not given the chance to make this argument because the Court sustained Plaintiff's objection based on an incorrect recollection that Abreu had never called Francis "a racist." *Id.* The Court is not persuaded that Defendants' planned argument in this regard would have impacted the outcome of the trial, especially considering that Defendants never objected to Abreu's testimony that Francis was "a racist" in the first place. Tr., 482:12-25. Any damage that may have been rendered

by hearing that Francis was "a racist" occurred on Plaintiff's direct examination, when Defendants did not object, rather than on closing arguments.  Considering counsel's objection during summations in the context of the trial as a whole, the Court does not find that this objection, or the Court's ruling on it, prejudiced Defendants such that a new trial is warranted.

Next, Defendants argue that Abreu's counsel inflamed the jury by beginning and ending his rebuttal summation with an "unfair and improper accusation of racism against Defendants' counsel and an attempt to impute that racism to Defendants."  Def. Memo, 14. Defendants take issue with the following portion of Plaintiff's rebuttal:

> This is not about circus animals.  One might say, oh don't be too sensitive.  In a case like this you need to be careful how you talk about and what you say.  Mr. Abreu, he's a wonderful man, and any analogy to a circus or him performing or me having a song and dance is an affront, and I'm calling it.  And at this point, ladies and gentlemen, you saw and heard what they think of Mr. Abreu even after all of this.

*Id.* (citing Tr., 1262:17-24).  The Court struggles to understand how this "can only be construed as an unfair and improper accusation of racism against Defendants' counsel," especially when, as Defendants themselves point out, the jury heard in Defendants' summation that "circus animals" was an analogy for "fake themes or red herrings."  *Id.* at 15; *see also* Tr., 1219:4-10.  Defendants further argue that Plaintiff's counsel impermissibly tied Defense counsel's conduct to punitive damages when he said in rebuttal: "What they did and said in their closing deserves punitive damages.  Don't be bound by my number."  Def. Memo, 15; *see also* Tr., 1272:8-10.  Assuming that this statement was improper, the Court nonetheless does not find that one

improper statement about punitive damages in the context of the whole trial is an error so serious that it "goes to the very integrity of the trial." *See Claudio*, 955 F. Supp. 2d at 156.

Defendants' final contention is that, in support of its argument that Verizon was required to consider seniority when making assignments to Fire Island, Plaintiff's counsel relied on an inapplicable provision of the collective bargaining agreement governing transfers on Fire Island.   Def. Memo, 18.   Not only did Defendants fail to object when Abreu first read this purportedly inapplicable provision during the trial, but they also failed to object during Plaintiff's counsel's summation on this point. Tr., 1209:24-1210:17.  The collective bargaining agreement was not the sole evidence in support of Plaintiff's argument that assignments on Fire Island were based on seniority.  As discussed above, Abreu and Moore testified as much, and the jury could reasonably credit their testimony.  Moreover, on cross-examination Defendants questioned Abreu about the collective bargaining agreement and obtained testimony from him that the agreement did not mention seniority with respect to transfers within a garage.  *Id.* at 616:11-617:10.  Accordingly, the jury had evidence from multiple sources about the collective bargaining agreement and the role that seniority played in determining assignments to Fire Island, and Plaintiff's counsel's error, if any, in referring to the wrong provision on summation is of little consequence in the context of the whole trial.

Finally, the Court notes that it has considered Defendants' argument that the damages award can be explained almost entirely by the prejudicial and inflammatory

effect of Abreu's counsel's conduct and statements during summations.  Def. Memo,
11.   Recognizing that the damages awarded were extremely high, the Court
nonetheless finds no reason to believe that summations pushed the jury to an award
that they would not have otherwise reached based on the evidence presented at trial
alone.  As discussed above, there were numerous factual disputes that hinged on the
jury's credibility determinations, and—without yet opining on whether the award is
permissible under the law—the Court finds that the jury could have reasonably based
its damages award on the evidence presented at trial, and were not unduly swayed
by summations.

### iii.   Jury's Consideration of Dismissed Claims

Next, Defendants contend that a new trial is warranted because the jury was
never instructed to disregard evidence of the constructive discharge and hostile work
environment claims after they were dismissed and was therefore "likely confused and
improperly left to consider evidence" of these claims.  Def. Memo, 16.

"A jury charge is erroneous if it misleads the jury as to the correct legal
standard, or if it does not adequately inform the jury of the law." *Dancy v. McGinley*,
843 F.3d 93, 116 (2d Cir. 2016) (internal quotation marks and citation omitted).  If,
however, the charge "taken as a whole, is correct and sufficiently covers the case so
that a jury can intelligently determine the questions presented to it[,]" it "will be
deemed adequate[.]"  *Id.*  Thus, a new trial will be granted based on an erroneous jury
charge only where the error is "sufficiently serious to undermine the very integrity of

54

the trial." *Id.* (internal quotation marks and citations omitted); *Theodat*, 2019 WL 4385794, at *3 (internal quotation marks and citation omitted).[24]

Here, Defendants do not contend that the Court erred in its charge on Plaintiff's discrimination and retaliation claims. Rather, they argue that it was plain error for the Court not to instruct the jury to disregard evidence of the dismissed claims or give the jury Defendants' proposed instruction that damages for emotional distress cannot be awarded where that distress is caused by factors such as Abreu's decision to retire. Def. Memo, 17.

Initially, the Court notes that it instructed the jury that it may "not award the plaintiff damages for any emotional distress unless the emotional distress was caused by the defendants' discriminatory or retaliatory conduct." Tr., 1301:18-23. The jury is presumed to have followed these instructions and not considered evidence of the dismissed claims. *See Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709 (1987) ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the [parties]."); *U.S. v. Whitten*, 610 F.3d 168, 191 (2d Cir. 2010) (citation omitted). The Court further notes that there is no indication—for example, from the questions the jury posed during deliberations—that the jury placed undue weight on evidence related to the dismissed claims. *See* Declaration of Frederick K. Brewington

---

[24] This standard of review is applied because Defendants failed to object to the jury charge at trial. *See Abel v. Town Sports Int'l, LLC*, No. 09-cv-10388, 2012 WL 6720919, at *19 (S.D.N.Y. Dec. 18, 2012); *see also Henry v. Dinelle*, 557 F. App'x 20, 22 (2d Cir. 2014).

Submitted in Opposition to Defendants' Motion for Judgment as a Matter of Law, or, Alternatively, a New Trial or a Conditional Order of Remittitur ("Brewington Decl."), DE [107-2], Exs. 4-5.  Further, the Court mitigated any impact concerning evidence relevant to a constructive discharge inquiry both by declining to instruct the jury as to constructive discharge and by not permitting it to award back pay or front pay.

Because the integrity of the trial was not undermined by the Court's decision not to instruct the jury to disregard evidence related to the dismissed claims, the Court does not find that a new trial is warranted on this basis.

## C. <u>Rule 59 Motion for Remittitur</u>

Finally, Defendants seek a remittitur of the damages award, arguing that there was no competent evidence to support the jury's award of (1) $55,000.00 in actual damages or (2) $750,000.00 in compensatory damages and (3) that the $1,850,000.00 in punitive damages should be vacated, or in the alternative, reduced. Def. Memo, 18-25.

### i. *Actual Damages*

The jury awarded $55,000.00 to "reasonably compensate[] . . . [P]laintiff for any overtime compensation that he would have earned at Verizon up until his [separation] . . . had he not been subjected to an adverse employment action."  Tr., 1300:24-1300:7.  Defendants argue that this award was "improper conjecture."  Def. Memo, 19.[25]

_____

[25] The Court rejects Plaintiff's argument that Defendants waived their right to contest this award by not doing so when they made their Rule 50(a) motion.  *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Judgment as a Matter of Law, or, Alternatively, a New Trial or a Conditional Order of Remittitur ("Pl. Opp."), DE [107], 17.  While an argument raised in a Rule

To recover damages, a plaintiff must provide the factfinder with a "reasonable basis to calculate the amount of damages[,]" and the factfinder may not base its award "on speculation or guesswork." *Holness v. Nat'l Mobile Television, Inc.*, No. 09-cv-2601, 2012 WL 1744847, at *3 (E.D.N.Y. Feb. 14, 2012), *adopted as modified*, 2012 WL 1744744 (E.D.N.Y. May 15, 2012) (quoting *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992)).  Thus, at trial, Plaintiff bore "the burden of proving damages with reasonable certainty."  *See State v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 687 (S.D.N.Y. 2017), *aff'd*, 942 F.3d 554 (2d Cir. 2019) (internal quotation marks, citation and alterations omitted).

Abreu testified that he made $20,000.00 to $40,000.00 a year in overtime on Fire Island, and according to Moore, employees on Fire Island could make "probably" $20,000.00 in overtime per year.  Tr., 413:2-9, 492:1-16, 509:11-510:3.  To show the discrepancies between his earnings in 2011 and 2012, when he was still on Fire Island, and his earnings in 2013 and 2014, after he had been transferred to the Mainland, Plaintiff submitted his W-2 Forms from 2011 to 2014.  *Id.* at 587:13-593:23.  Abreu's W-2 Forms indicate that on Fire Island, he made the most in 2011 and on the Mainland, he made the least in 2014.  The difference between Plaintiff's wages in his best year on Fire Island, $94,378.00, and his worst year on the Mainland, $55,959.00, amounts to $38,419.00.  *Compare* Pl. Tr. Ex. 57E *with* Pl. Tr. Ex. 57B.

---

50(b) motion must first have been raised under Rule 50(a) in order to avoid waiver, the same is not true under Rule 59, and the Court now considers Defendants' argument regarding actual damages. *See Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 527 (S.D.N.Y. 2013) ("Waiver under Rule 50 . . . does not imply waiver under Rule 59.") (citing *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004)).

As Defendants pointed out on cross-examination of Abreu, and again in the instant motion, Plaintiff was on short-term disability leave for six months from the end of 2013 to 2014, during which time he was not paid.  Tr., 761:18-764:22; *see also* Def. Memo, 5, n.5.  Thus, the lower earnings in 2013 and 2014 appear to be due to Abreu's disability leave, and therefore, Defendants argue, an award based on lost overtime is not warranted.  What Defendants ignore, however, is that Plaintiff took disability leave as a result of the depression and anxiety purportedly experienced as a result of Defendants' unlawful discriminatory and retaliatory treatment of him.  Based on Abreu's work history on Fire Island, the jury was entitled to believe that had it not been for Defendants' conduct, Plaintiff would not have taken disability leave and thus continued to make higher wages due to the greater opportunities for overtime available on Fire Island.  Viewing the evidence in the light most favorable to Abreu, the Court finds that Plaintiff submitted competent evidence from which the jury could calculate his lost overtime payments with reasonable certainty.[26]  That being said, the Court finds that the jury's award of $55,000.00 overstates Abreu's lost income as a result of Defendants' unlawful conduct.  Rather, the proper amount is reflected in Plaintiff's W-2 Forms, which establish that he lost $38,419.00 in pay after he was transferred off Fire Island.

---

[26] Defendants' reliance on *Amna v. New York State Dep't of Health* is misguided.  There, the plaintiff had presented time sheets for herself and one colleague to show that her colleague was given more overtime hours than she had been, but provided no evidence that she and the colleague were in similar positions to receive overtime hours.  *See* No. 08-cv-2806, 2011 WL 4592787, at *7 (E.D.N.Y. Sept. 30, 2011), *aff'd sub nom. Amna v. New York Dep't of Health*, 505 F. App'x 44 (2d Cir. 2012).  Accordingly, the court found the plaintiff's allegations of unequal overtime opportunities to be nothing more than "unsupported speculation."  *Id.*  Here, Abreu is not comparing himself to another employee, but is instead comparing his wages on Fire Island with those he earned while on the Mainland.

Based on Abreu's W-2 Forms, the Court concludes that a remittitur to $38,419.00 in actual damages is warranted.

*ii. Compensatory Damages*

The jury also awarded plaintiff $750,000.00 in compensatory damages "for pain, suffering or emotional distress." Def. Decl., Ex. P, 4-5. Defendants argue that this award was excessive when compared to other cases involving similar levels of emotional distress. Def. Memo, 19-21. The Court agrees.

As there is "no objective way to assign any particular dollar value to distress[,]" awards for emotional distress are "inherently speculative." *Stampf*, 761 F.3d at 205. Indeed, "New York cases vary widely in the amount of damages awarded for mental anguish." *Cross*, 417 F.3d at 258 (internal quotation marks and citation omitted). Nonetheless, "a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate." *Stampf*, 761 F.3d at 205 (internal quotation marks and citation omitted). In this Circuit, emotional distress awards for discrimination and retaliation are generally grouped into three categories of claims: "garden variety," "significant" and "egregious." *Emamian v. Rockefeller Univ.*, No. 07-cv-3919, 2018 WL 2849700, at *16 (S.D.N.Y. June 8, 2018) (internal quotation marks and citation omitted). In "garden variety" claims, "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." *Id.* (internal quotation marks and citation omitted). Such claims generally merit awards ranging from $30,000.00 to

$125,000.00.  *Id.* (citations omitted); *Ravina v. Columbia Univ.*, No. 16-cv-2137, 2019 WL 1450449, at *11 (S.D.N.Y. Mar. 31, 2019).  By contrast, "significant" emotional distress claims, which typically warrant awards between $50,000.00 to $200,000.00, are "based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Emamian*, 2018 WL 2849700, at *16 (internal quotation marks and citation omitted). Finally, "egregious" claims "generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff[,]" and such awards can exceed $200,000.00.  *Ravina*, 2019 WL 1450449, at *12 (internal quotation marks and citation omitted).

Here, the Court views Abreu's injuries as significant.  Plaintiff testified about his anxiety, insomnia and panic attacks. Tr., 541:19-543:2.  He went on to explain that there were times when he could not leave his house because he felt afraid, he had recurring nightmares about work, and he had thoughts of harming himself or others.  *Id.* at 543:8-20, 555:17-556:8, 561:23-562:10, 609:20-610:12, 612:5-12.  His relationship with his family and wife suffered to the point where he believed his marriage was going to end as soon as his children finished college.  *Id.* at 543:23-544:2, 547:11-22. Abreu's psychiatrist, Dr. Chan, testified that Plaintiff suffered from major depressive disorder and anxiety, caused by Defendants' conduct.  *Id.* at 848:12-851:4; Def. Decl., Ex. N.  Dr. Chan described Abreu's symptoms of depression, severe anxiety, panic attacks, terminal insomnia, anhedonia and thoughts of suicide and

recommended that he take disability leave.  Tr., 844:21-845:7; *see also id.* at 555:17-556:8.  Plaintiff's testimony was corroborated by two additional doctors:  Dr. Dackow, who treated Abreu for post-traumatic stress disorder, *id.* at 838:19-840:13, and Dr. Elmore, who determined that there was a causal relationship between Plaintiff's post-traumatic stress disorder and work-related events.  *Id.* at 571:6-12; Def. Decl., Ex. O.

In considering the appropriate damages award, the Court looks to other cases involving significant emotional distress, where the evidence included not only plaintiff's testimony, but also the account of a medical professional.  *Emamian v. Rockefeller University* and *Lore v. City of Syracuse* are instructive.  In *Emamian*, plaintiff suffered from anxiety and insomnia and was diagnosed with generalized anxiety disorder and trichotillomania, a condition characterized by hair-pulling due to anxiety and stress.  *See* 2018 WL 2849700, at *2.  The plaintiff testified that the discrimination she had experienced "made her want to die" and that she felt "anxious" and had "difficulty sleeping."  *Id.*  The plaintiff's psychiatrist corroborated her testimony and linked her symptoms to "the overwhelming stress that she experienced at work . . . as a result of her perceptions that she was being discriminated against . . ."  *Id.* at *3.  After the jury awarded $2,000,000.00 in compensatory damages for emotional distress, the district court granted a remittitur to $200,000.00, finding that this was the "maximum amount that would be upheld as not excessive and would not materially deviate from reasonable compensation in comparable cases."  *Id.* at *17-*19 (internal quotation marks, citations and alterations omitted).  In *Lore*, the Second Circuit upheld an award of $250,000.00 for emotional and reputational injury where

the evidence of emotional distress included plaintiff's own testimony that she suffered from "tension headaches, abdominal pain, insomnia, anxiety, and depression," which was corroborated by her medical records and by the testimony of her mother. *See* 670 F.3d 127, 178-79 (2d Cir. 2012). Of this amount, only $150,000.00 was for emotional distress, while the remaining $100,000.00 was for reputational injury. *Id.* at 179. The case upon which Defendants rely, *Rainone v. Potter*, where an award for emotional damages was reduced from $175,000.00 to $50,000.00, is distinguishable. Def. Memo, 20-21. There, the plaintiff provided only testimony that his "mind was swimming; that his future looked extremely grim; and that he had developed sleeping and other manifestations." 388 F. Supp. 2d 120, 124-25 (E.D.N.Y. 2005) (internal quotation marks and citation omitted). Moreover, the plaintiff there had testified that he did not consider himself incapacitated "in any way, shape, or form[,]" and was "enjoying a productive life[.]" *Id.* at 125 (internal quotation marks and citation omitted). By contrast, Abreu testified at length about how, as a result of Defendants' conduct, he no longer felt like himself, and although he was no longer in therapy at the time of trial because leaving Verizon had "helped a lot," Plaintiff continued to have relapses and felt that he needed further treatment. Tr., 541:19-542:9, 544:16-25, 572:6-17, 607:20-608:9.

Given the above and the trial record as a whole, the Court finds that a remittitur to $200,000.00 in compensatory damages is warranted.

### iii.   *Punitive Damages*

Finally, Defendants seek to vacate the jury's award of $1,850,000.00 in punitive damages. As an initial matter, the Court rejects Plaintiff's contention that Defendants waived their objections regarding punitive damages by failing to object on the record before jury deliberations.[27] Pl. Opp., 25-27. Although Defendants did not raise any objections on the record during the conference charge, Tr., 1140:3-1149:25, 1172:1-1178:6, the Court informed the parties that their objections would be preserved by submission of their proposed jury charges and verdict sheets. *Id.* at 1152:3-22. Accordingly, the Court finds that Defendants have preserved their objections through their submissions of proposed jury instructions and a proposed verdict sheet. *See* Brewington Decl., ¶ 3; Brewington Decl., Ex 2, 19; Def. Decl., Ex. Q.

In reviewing Defendants' submissions, however, the Court finds that they did not adequately raise the objection they make now—that the jury should not have been given the option to award punitive damages because there was no evidence that Defendants engaged in intentional discrimination. Def. Memo, 21. Defendants' submissions—proposed jury instructions—simply added one paragraph to the punitive damages section, which the Court included in the final instructions. *Compare* Brewington Decl., Ex. 2, 19 *with* Tr., 1303:15-1304:14. At no point did

---

[27] Failure to timely object results in a waiver of the right to challenge the submission of a punitive damages charge or errors in the verdict sheet. *See Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006).

Defendants suggest that there was insufficient proof of the requisite mental state that could justify an award of such damages. Accordingly, Defendants did not preserve the objection they now raise. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 77 (2d Cir. 2001).

Where an objection to a jury charge is unpreserved, the Court reviews for plain error. *See Abel*, 2012 WL 6720919, at *19. Under this standard, which "should only be invoked with extreme caution in the civil context[,]" a new trial is warranted only where the unpreserved error is "so serious and flagrant that it goes to the very integrity of the trial[.]" *Id.* (internal quotation marks and citation omitted).

Here, the Court provided the following instructions on punitive damages:

> If the plaintiff has proven by a preponderance of the evidence that the defendants are liable, you must also determine whether he is entitled to punitive damages. In order to be entitled to punitive damages, the plaintiff must prove by a preponderance of the evidence that the defendants, in causing the injuries complained of, showed malice or reckless indifference for the rights of others. An action is with malice if a person knows that it violates the law prohibiting discrimination or retaliation and does it anyway. An act is done with reckless indifference if it is taken with knowledge that it may violate federal law. It is entirely within your discretion as jurors to determine whether an award of punitive damages is appropriate in this case, even if all the elements I have described have been established by the plaintiff. You must keep in mind, however, that you are not required to award punitive damages. To make such a judgment, it is important to keep in mind the reason for an award of punitive damages; namely to punish the defendant for malicious conduct against the plaintiff, and to deter such future conduct of the defendants or of others like the defendants. Thus, you should consider whether the award of punitive damages will accomplish this dual purpose of punishment and deterrence.

Tr., 1303:15-1304:14. The Court's instructions correctly stated the legal standard for punitive damages, and the fact that Defendants believe that "there was no malicious or reckless conduct sufficient to warrant punishment in the form of punitive

damages[,]" Def. Memo, 21, is insufficient to warrant vacating such damages.  A jury instruction is warranted as long as "there is some evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury." *Cameron v. City of New York*, 598 F.3d 50, 69 (2d Cir. 2010) (internal quotation marks and citation omitted).  As set forth above, the jury heard evidence upon which it could conclude that Defendants showed deliberate indifference to Plaintiff's rights, discriminating and retaliating on the basis of race and national origin.  Accordingly, the Court denies Defendants' motion to vacate the punitive damages award on this ground.

Next, Defendants argue that the award should be vacated due to errors in the verdict sheet.  Def. Memo, 22-23.  Defendants argue that the verdict sheet should have differentiated among Defendants or claims because punitive damages are assessed separately against individual defendants, and an "undifferentiated verdict makes it impossible" to determine against whom the jury intended to award punitive damages.  *Id.*  Defendants submitted a proposed verdict sheet which differentiated among Defendants, and thus, as set forth above, this objection is preserved.  Def. Decl., Ex. Q.  Plaintiff concedes that the verdict sheet should have differentiated between Francis and Lucas.  Pl. Opp., 26.  He argues, however, that any errors in the verdict sheet "worked no harm to Verizon because its responsibility for punitive damages sounds in *respondeat superior* liability[,]" and thus the result would have been the same had Abreu "only sued Verizon and presented the same evidence regarding Francis and Lucas."  Def. Memo, 26-27.  The Court disagrees.

Under Title VII, an employer may be held liable for the malicious or recklessly indifferent discrimination of its employees where an employee serving in a managerial capacity commits the wrong within the scope of his employment. *Parrish*, 280 F. Supp. 2d at 153.  The employer may escape liability for its employee's malicious or recklessly indifferent discrimination, however, if it establishes "both that it had an anti-discrimination policy and made [a] good faith effort to enforce it." *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001) (citations omitted). Where evidence is presented in support of both components of this defense, "an employer is entitled to have the defense considered by the jury under proper instructions." *Id.*  Similarly, under § 1981, "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with [federal law]." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545-56, 119 S.Ct. 2118, 2129-30 (1999)).

Here, the evidence established that Verizon has in place anti-discrimination and anti-retaliation policies, and that its managers, Francis, Lucas and Bolger had been trained on these policies.  Tr., 63:20-66:11, 120:16-122:4, 346:23-352:25, 1013:9-1015:11.  Further, when Abreu filed his complaint with the Global Ethics Hotline in 2012, Verizon interviewed Plaintiff as well as Lucas and Bolger, *id.* at 252:7-13, 508:4-509:18, 1003:19-24, thereby indicating a "good faith effort" to enforce its policy. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 573-74 (2d Cir. 2011) (holding that a reasonable jury could have found that employer had made a

good-faith effort to comply with its Title VII obligations, where it had anti-discrimination and anti-retaliation policy, all employees received training on policies and it provided employees with avenues to report discrimination or retaliation); *Wiercinski*, 787 F.3d at 115-16 (noting "high standard for punitive damages set forth in [§ 1981]" and affirming vacatur of punitive damages where employer addressed plaintiff's complaints "in good faith"). Thus, the jury could have reasonably found that while Francis and Lucas were liable for punitive damages, Verizon was not. As Defendants contend, an "undifferentiated verdict makes it impossible" to determine against whom the jury intended to award punitive damages. Def. Memo, 23. Even assuming arguendo that there was sufficient evidence for the jury to reasonably infer that Verizon's investigation was not a good faith effort to enforce its policies such that Verizon did not meet the standard to be excused from liability for Francis's and Lucas's malicious or recklessly indifferent discrimination, the jury could not have come to such a decision without some instruction on this standard, *i.e.*, that even if Francis and Lucas met the standard for punitive damages, Verizon could escape liability for punitive damages if it had a policy in place and used good faith efforts to enforce it. And without a differentiated verdict, it is impossible to know whether the jury meant to punish Francis, Lucas and Verizon, or only Francis and Lucas but not Verizon, the latter being a legally supported result from the same evidence presented.

Thus, the Court finds that the punitive damages award should be vacated.[28] Accordingly, Defendants' motion for remittitur is granted, and actual damages are

---

[28] For the sake of completeness, the Court notes that even upon a finding that the punitive damages award should stand, the award would nonetheless be substantially reduced. When deciding

reduced from $55,000.00 to $38,419.00, compensatory damages are reduced from $750,000.00 to $200,000.00, and punitive damages are reduced from $1,850,000.00 to $0.00.  Should Plaintiff not accept the remitted damages verdict, Defendants' motion for a new trial is granted as to damages only and denied as to liability.

## IV.   CONCLUSION

For the reasons stated herein, Defendants' motion for judgment as a matter of law under Rule 50(b) is denied in all respects.  Defendants' Rule 59 motion for a new trial on damages is granted with respect to (i) actual and compensatory damages if Plaintiff does not accept the remitted awards of $38,419.00 and $200,000.00 respectively and (ii) punitive damage, unless Abreu accepts the vacated award.

---

whether punitive damages are excessive, courts consider: (1) "the degree to which the conduct at issue is reprehensible"—which is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award[]"; (2) "the ratio of punitive damages to the actual harm suffered by a plaintiff"; and (3) the difference between the punitive damages award and the civil penalties that could be imposed for comparable misconduct. *Jennings v. Yurkiw*, No. 14-cv-6377, 2019 WL 6253813, at *5-*6 (E.D.N.Y. Nov. 22, 2019) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575-85, 116 S.Ct. 1589, 1598-1604 (1996)).  Without undergoing a full analysis of these three factors, the Court notes simply that a comparison of the punitive damages award in this case to the awards sustained in other comparable cases indicates that the $1,850,000.00 award was impermissibly excessive.  Comparing punitive damages awards in the discrimination and retaliation context can be "of limited utility because a wide range of awards have been upheld." *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 76 (E.D.N.Y. 2002) (citations omitted).  Nonetheless, most punitive damages awards for conduct involving a degree of reprehensibility similar to Defendants' have been significantly lower than the award that was granted in this case. *See, e.g.*, *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 149 (2d Cir. 2011) (affirming remittitur of a $1,600,000.00 punitive damages award to $90,000.00, where the retaliatory conduct occurred over a period of time and "was more than merely negligent," but did not result in physical injury to plaintiff or show an indifference to or reckless disregard for the health or safety of others); *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 330-31 (S.D.N.Y. 2018) (granting remittitur of a $750,000.00 punitive damages award to $125,000.00, where there was repeated harassment, but no evidence of violence, physical injury, financial vulnerability or deceit); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 580 (S.D.N.Y. 2011) (granting remittitur of a $1,000,000.00 punitive damages award to $50,000.00, where the retaliatory conduct involved neither violence nor offensive language); *Norris v. N.Y.C. Coll. of Tech.*, 07-cv-853, 2009 WL 82556, at *7-*8 (E.D.N.Y. Jan. 14, 2009) (granting remittitur of a $425,000.00 punitive damages award to $25,000.00 for retaliatory termination, where defendant "acted intentionally and with knowledge that his conduct would violate [plaintiff's] rights, [but] no other indicia of reprehensibility [were] present").

Defendants' motion for a new trial is denied in all other respects.  On or before April 24, 2020, Plaintiff shall inform the Court whether he accepts the remitted amount for damages, or whether the Court shall grant Defendants' motion for a new trial on actual, compensatory and punitive damages.

Dated:        Central Islip, New York
              March 25, 2020

                                 **SO ORDERED**

                                 /s/ Steven I. Locke
                                 STEVEN I. LOCKE
                                 United States Magistrate Judge